1 Cal.App.4th 814 (1991)
2 Cal. Rptr.2d 429
In re ROCCO M., a Minor.
CONTRA COSTA COUNTY DEPARTMENT OF SOCIAL SERVICES, Plaintiff and Respondent,
v.
CATHERINE P., Defendant and Appellant.
Docket No. A050854.
Court of Appeals of California, First District, Division Two.
December 11, 1991.
*816 COUNSEL
Mat Zwerling and Joyce Sutliff for Defendant and Appellant.
Victor Westman, County Counsel, and Valerie J. Rancke, Deputy County Counsel, for Plaintiff and Respondent.
OPINION
KLINE, P.J.
This is an appeal from an order of the juvenile court adjudging Rocco M. a dependent child as described in Welfare and Institutions Code section 300,[1] subdivision (b). Rocco's mother, Catherine P., challenges the order on the grounds that (1) the court improperly took *817 judicial notice of its file in previous proceedings concerning Rocco; and (2) the evidence was insufficient to support the finding of dependency. We affirm the order.

FACTS
In May 1990, the department filed a petition seeking to have Rocco, then 11 years old, declared a dependent child. As later amended, the petition alleged that Rocco was a person described in section 300, subdivision (b), in that "1) The minor's mother has a history of alcohol and drug abuse problems which interfere with her ability to adequately parent, provide for and supervise the minor, i.e., [¶] (a) On or about May 2, 1990, the minor was left in the care of a relative who was arrested on that date for possession of heroin and methamphetamines; [¶] (b) On or about April 3, 1990, the minor was left in the care of a friend of mother's who kicked him in the stomach. [¶] 2) The minor was a dependent of the Juvenile Court of Contra Costa County, placed out of parental care, for approximately three years, from December 1984 to February 1988, as a result of mother's neglect of his basic needs."
At the jurisdictional hearing on June 25, 1990, county counsel asked the court to judicially notice the file in the prior proceedings referred to in the petition. After a lengthy colloquy, described in greater detail below, the court granted this request.
Rocco then testified as follows: He was in foster care for a few years until about 1988. He and his mother then lived at his Uncle John's house, where things went fine. About a year before the hearing, they moved to an address in Martinez; since then, things had not gone too well. His mother "started drinking ... and she's doing more drugs and hanging around my Aunt more often and she started messing up. She wasn't taking care of me like she was supposed to." He saw her drinking wine, vodka, and a liquor called Cisco. He remembered in particular that she was drinking on April 8, which was the anniversary of the death of Rocco's father and the date on which she said she would stop drinking. He has seen her drink two bottles of Thunderbird in a day.
Some months before May 1990, Rocco found drugs in the bathroom. He thought it was cocaine; it consisted of white powder in a baggy and there was a mirror and straw next to it.
On two or three occasions Rocco's mother left him with a person named Steve Peoples. Peoples was generally nice but he got mad at Rocco one time *818 when Rocco told him he didn't want him in his house. Rocco said he didn't want him to stay anymore and told him to leave. Peoples got mad, kicked Rocco in the ribs, and then locked him out of the house. Although Rocco was hurt by the kick, it was not hard enough to leave a bruise.
Around the beginning of May, Rocco's mother planned to enter the hospital and arranged for him to stay with Aunt Toni, Uncle John's ex-wife. Rocco had gone there frequently in the past and had stayed there overnight. He had seen drugs there. On this occasion, after spending one or two nights there, he came home from school to find Aunt Toni gone and the home in disarray. While searching for Aunt Toni he encountered his mother, and together they went to the jail, where his mother said Aunt Toni was being held on a drug charge. He ended up returning to his mother's house and spending that night with her, but the next night he could not find her and spent the night at the house of a friend. The next morning he went to Uncle John's house and was told that his mother was in the hospital.
Around the middle of May, Rocco moved back with his grandmother. When his mother left the hospital she didn't tell Rocco; he only found out after his grandmother checked her house and found his mother there.
Rocco testified that his mother had been "there for [him]" during the year they lived with Uncle John, but not during the year just past. During the earlier year, he said, she'd be there when he got home from school "and I'd get to do stuff with her and stuff like that before she started drinking and doing drugs again. She did really good just to get me back and then she blew it again." During the period leading up to the petition, Rocco's mother was usually not home when he arrived home from school. She would call him and say she was on her way home, but hours later she would not have arrived, and perhaps she would call again to say she was coming. She would come home later, but by then he would usually have gone to a friend's or back to his uncle's house. He said he wanted to go back to her house only "after she straightens up. After she quits drugs and alcohol."
The court sustained all the allegations of the petition and found Rocco to be "a person described by Section 300A."[2] This was followed by a dispositional order directing out-of-home placement, which was in turn followed by this timely appeal.

*819 JUDICIAL NOTICE
As previously noted, county counsel asked the court to judicially notice, in connection with the second count, "the findings that it has made in the previous dependency involving this child." The court asked whether there was any objection to its taking judicial notice of "the prior file." Counsel for appellant expressed reluctance to agree to "the wholesale review of everything in that report." After further discussion the court asked whether counsel had "any objection to me being allowed to review and take notice judicially of the, basically the court orders, the petition and I guess the court reports in the previous file to determine at some future point whether count 2 should be sustained?" Counsel replied, "Yes, insofar as it proves count 2 or any facts which tend to support some other assertion besides count 2, I would object." Counsel then alluded to the "inartful drafting" of the petition. The court asked what was inartful about it; counsel stated that he stood on his objection; and the court said, "Your objection is overruled. I'll take judicial notice of the entire file." Counsel asked whether this meant "[e]verything contained within that file," and the court replied, "Yes." However, the relevant minute entry states that the court took judicial notice "as requested by County Counsel."
(1) We do not believe this ruling was erroneous, as Catherine contends. The court was explicitly authorized to take judicial notice of the file under Evidence Code section 452, subdivision (d)(1).[3] This did not necessarily mean every assertion found in the file could be accepted as proof of the matter asserted. (See 1 Witkin, Cal. Evidence (3d ed. 1986) Judicial Notice, § 102, pp. 88-89.) On the other hand, there is no blanket rule making all such statements inadmissible. (See In re Malinda S. (1990) 51 Cal.3d 368, 385 [272 Cal. Rptr. 787, 795 P.2d 1244] [social studies admissible and competent evidence on which to base jurisdictional finding].) Assuming portions of the file were inadmissible, it was incumbent upon Catherine to identify them and state a cognizable objection. Evidence Code section 353, subdivision (a), forbids setting aside a decision on grounds of the erroneous admission of evidence unless the record contains a timely objection or motion to strike or exclude "so stated as to make clear the specific ground of the objection or motion."
With the possible exception of relevancy, no specific ground of objection was mentioned in the court below, and that ground was not asserted as to any specific portion of the file but apparently to the file as a whole. As a result, the record fails to establish that the court improperly considered anything from the earlier file, that it overruled a proper objection, or that any such *820 error, if it occurred, resulted in a "miscarriage of justice." (Evid. Code, § 353, subd. (b).) Accordingly no reversible error appears on this point.

SUFFICIENCY OF EVIDENCE
Catherine contends that the evidence was insufficient to support a finding that Rocco came within the statutory definition of a dependent child. (2) In addressing this contention, we are constrained by familiar principles: "In juvenile cases, as in other areas of the law, the power of an appellate court asked to assess the sufficiency of the evidence begins and ends with a determination as to whether or not there is any substantial evidence, whether or not contradicted, which will support the conclusion of the trier of fact. All conflicts must be resolved in favor of the respondent and all legitimate inferences indulged in to uphold the verdict, if possible." (In re Katrina C. (1988) 201 Cal. App.3d 540, 547 [247 Cal. Rptr. 784].) "`If the evidence so viewed is sufficient as a matter of law, the judgment must be affirmed....'" (In re Brittany H. (1988) 198 Cal. App.3d 533, 549 [243 Cal. Rptr. 763], quoting In re Gano (1958) 160 Cal. App.2d 700, 705 [325 P.2d 485] [Civ. Code, § 232 proceeding].)
(3a) The question here is whether substantial evidence supports the finding that Rocco was, at the time of the hearing, a person described in section 300, subdivision (b).[4] The statutory definition consists of three elements: (1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) "serious physical harm or illness" to the minor, or a "substantial risk" of such harm or illness.
Here there is ample evidence of neglect, i.e., failure to adequately supervise or protect the minor. As Rocco testified, his mother simply "was not there" for him much of the time. The central issue is whether the evidence was sufficient to justify a finding that as a result of this neglect Rocco had suffered, or there was a "substantial risk" that he would suffer, "serious physical harm or illness."
(4) This language was introduced into section 300 as part of the wholesale revision of that statute in 1987. (1987 Stats., ch. 1485, § 4, p. 5603.) *821 One court has expressed the view that the amended statute did not adopt new criteria for finding a child to be within the jurisdiction of the juvenile court. (In re Steve W. (1990) 217 Cal. App.3d 10, 28 [265 Cal. Rptr. 650].) We disagree.
Under the former statute, a child could be declared dependent if he or she was "in need of proper and effective parental care or control and ha[d] no parent or guardian ... willing to exercise or capable of exercising such care or control, or ha[d] no parent or guardian actually exercising such control." (Former § 300, subd. (a), repealed Stats. 1987, ch. 1485, § 3, p. 5603.) By judicial gloss, the statute was held applicable only to "`rather extreme cases of neglect, cruelty or continuing exposure to immorality.'" (In re J.T. (1974) 40 Cal. App.3d 633, 640 [115 Cal. Rptr. 553], quoting In re Raya (1967) 255 Cal. App.2d 260, 265 [63 Cal. Rptr. 252].) Still, it differed from the current statute in that it required no separate showing of concrete harm or risk of physical harm to the child. The addition of such a requirement implies that the Legislature intended to narrow the grounds on which juvenile court jurisdiction could be invoked.
This implication is reinforced by such extrinsic evidence of legislative intent as we have found. The 1987 revisions to section 300 were proposed by a task force established by the Legislature in 1986. (1986 Stats., ch. 1122, § 24, p. 3995.) According to one member of the task force, the purpose of the revisions was "to replace the general provisions of the former statute with more specific and narrowly drawn requirements that would eliminate the wide discretion given to courts and child welfare workers under the old provisions, while continuing to allow assumption of dependency in all situations in which the minor is at risk." (2 Cal. Juvenile Court Practice (Cont.Ed.Bar Supp. 1990), § 15.1, p. 4.)
Similarly, the consultant's report for the Assembly Committee on Human Services stated that the revised section 300 would "[c]larif[y] the definition of abuse.... The decision to remove a child from his or her home and/or terminate parental rights would be based on the immediate danger or `substantial risk' of danger to the child. Under current law, the definition of abuse is broader; it includes provisions regarding lack of parental control and is not focused solely on the immediate danger to the child. The bill would more clearly define the conditions under which a child could be removed from the family." (Consultant's Rep. on Sen. Bill No. 243, Assem. Com. on Human Services (July 8, 1987), p. 1.)[5]
*822 Later the report provides several numbered "Comments": "[1].... This bill is the result of the Task Force deliberations. It is intended to clarify conditions under which children could be removed from their homes. It would establish more specific guidelines for social workers who intervene in families when reports of abuse are filed.... [2] The proponents of the bill suggest that there is reason to believe that not all present removals are needed. In some cases, the danger to the child is simply not great enough to warrant separation, even though court jurisdiction may be appropriate.[[6]] In other situations, preventive services are certainly less traumatic and might eliminate the need for removal.... [¶ 3] The Task Force determined that ... section 300 presently gives very little guidance to investigating and petitioning agencies, to judges, attorneys or to parents as to what actions or harms justify state intervention.... Because there is little legislative guidance, different agencies and individuals employ different standards, and cases are inappropriately brought into the system. [¶ 4] Opponents of the legislation believe that there will be children who under current statute would be served by the system, and will not be eligible under the provision of SB 243. Given this is the only child welfare system available, they believe statute [sic] should be left as vague as possible to allow a judge to make the appropriate decision." (Consultant's Rep. on Sen. Bill No. 243, supra, at p. 4.) Inferentially, it was to address this concern that the enacting legislation included a provision requiring the Health and Welfare Agency to "review the effect of this act on minors adjudged dependent children of the juvenile court, including any minors presently eligible for such adjudication who will not be eligible for adjudication after January 1, 1990." The agency was directed to "prepare recommendations for a new program to be implemented ... to meet the needs of minors presently eligible for juvenile court *823 adjudication who will not be eligible for adjudication on or after January 1, 1990...." (Stats. 1987, ch. 1485, § 57, p. 5644.)[7]
The legislative history thus confirms an unmistakable intention to narrow the grounds on which children may be subjected to juvenile court jurisdiction.
Subdivision (b) means what it says. Before courts and agencies can exert jurisdiction under section 300, subdivision (b), there must be evidence indicating that the child is exposed to a substantial risk of serious physical harm or illness.
In determining what constitutes a substantial risk of serious physical harm, some general guidance may be drawn from subdivision (a) of section 300, which uses the same language to authorize jurisdiction where "[t]he minor has suffered, or there is a substantial risk that the minor will suffer, serious physical harm inflicted nonaccidentally upon the minor by the minor's parent or guardian." For purposes of that subdivision, "a court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the minor or the minor's siblings, or a combination of these and other actions by the parent or guardian which indicate the child is at risk of serious physical harm." (§ 300, subd. (a).) By its terms this provision is limited to cases brought under subdivision (a). It is, however, purely advisory and illustrative. We may safely accept it as a source of illumination in interpreting subdivision (b).
Some cautious guidance may also be drawn from cases decided under the law antedating the statutory revisions. Given that the pre-1987 statute afforded broader jurisdictional grounds, we may reasonably infer that, in the absence of cogent reasons for a contrary conclusion, facts held insufficient to *824 satisfy the earlier statute will also fail to satisfy the revised statute. Also potentially instructive are cases addressing the similar requirement of section 361, subdivision (b)(1), that a home-removal order be supported by evidence of "a substantial danger to the physical health of the minor."
From such sources the following principles may be drawn: While evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances at the time of the hearing subject the minor to the defined risk of harm. (See In re James B. (1986) 184 Cal. App.3d 524, 529 [229 Cal. Rptr. 206]; In re Katrina C., supra, 201 Cal. App.3d 540, 546.)[8] Thus the past infliction of physical harm by a caretaker, standing alone, does not establish a substantial risk of physical harm; "[t]here must be some reason to believe the acts may continue in the future." (In re Jennifer P. (1985) 174 Cal. App.3d 322, 326 [219 Cal. Rptr. 909]; see In re James B., supra, 184 Cal. App.3d 524, 529-530; compare In re Nicole B. (1979) 93 Cal. App.3d 874, 881 [155 Cal. Rptr. 916]; In re Tiffany Y. (1990) 223 Cal. App.3d 298 [272 Cal. Rptr. 733]; In re Jessica B. (1989) 207 Cal. App.3d 504, 517 [254 Cal. Rptr. 883]; In re Lisa D. (1978) 81 Cal. App.3d 192, 196-197 [146 Cal. Rptr. 178].) Moreover the fact that a child has been left with other caretakers will not warrant a finding of dependency if the child receives good care. (See In re Antonio F. (1978) 78 Cal. App.3d 440, 452 [144 Cal. Rptr. 466]; compare In re Robert P. (1976) 61 Cal. App.3d 310, 315-316 [132 Cal. Rptr. 5].)
Cases finding a substantial physical danger tend to fall into two factual patterns. One group involves an identified, specific hazard in the child's environment  typically an adult with a proven record of abusiveness. (E.g., In re Travis C. (1991) 233 Cal. App.3d 492 [284 Cal. Rptr. 469][sexual abuse by father]; In re Tiffany Y., supra, 223 Cal. App.3d 298 [death of sibling by molestation; mother continued to be attached to father and to deny his apparent culpability].) The second group involves children of such tender years that the absence of adequate supervision and care poses an inherent risk to their physical health and safety. (E.g., In re Corey A. (1991) 227 Cal. App.3d 339 [277 Cal. Rptr. 782] [one-year-old child with congenital defects and possible fetal alcohol syndrome]; In re Stephen W. (1990) 221 Cal. App.3d 629 [271 Cal. Rptr. 319] [infant]; In re Jeffrey P. (1990) 218 Cal. App.3d 1548 [under three years old]; see also, In re Rodger H. (1991) 228 Cal. App.3d 1174 [279 Cal. Rptr. 406][severely retarded infant]; In re Robert P., supra, 61 Cal. App.3d 310 [two-year-old].)
*825 In light of these authorities we seriously question whether the dependency order is adequately supported by evidence of (1) appellant's general failure to supervise Rocco, (2) the one instance of physical abuse by a caretaker, or (3) appellant's having neglected Rocco in infancy. At 11 years, Rocco was old enough to avoid the kinds of physical dangers which make infancy an inherently hazardous period of life. There was no evidence appellant should have anticipated that Rocco might be physically abused by Peoples, no evidence such conduct was repetitive, and no demonstrated danger it would recur. Indeed, there was no evidence Rocco would ever again be placed in Peoples' care. We see little indication of physical danger in the general lack or inadequacy of Catherine's supervision. Rocco proved that he could take care of himself, at least physically, on these occasions, generally by placing himself under the care of other adults, including a grandmother and an uncle. The grandmother's care was presumably adequate since Rocco was ultimately placed in her care.
(3b) We need not decide whether this evidence alone might have supported the dependency order, however, because we hold that the trial court could find a substantial risk of serious physical harm in the fact that Rocco's mother created the danger that Rocco would ingest hazardous drugs. We begin with a purely legal premise, i.e., that a child's ingestion of illegal drugs constitutes "serious physical harm" for purposes of section 300. (See In re Stephen W., supra, 221 Cal. App.3d 629, 639 ["actual injury" alleged where petition stated that child was born under influence of opiates].) This leaves a largely factual question: Did Catherine's conduct create a "substantial risk" that Rocco would ingest drugs? The trial court could reasonably find that it did, in four distinct ways: (1) by placing or leaving drugs in a location or locations where they were available to Rocco; (2) by frequent and prolonged absences which created the opportunity for Rocco to ingest the drugs; (3) by neglecting Rocco's needs in a way which might be reasonably expected to create the kind of emotional and psychological conditions in which substance abuse typically thrives; and (4) by exposing Rocco to her own drug use, thus impliedly approving such conduct and even encouraging him to believe that it is an appropriate or necessary means of coping with life's difficulties.
In sum, we believe a trial court is entitled to infer that a child of Rocco's age is subjected to a substantial risk of serious physical harm when he or she is placed in an environment allowing access to drugs, with nothing to prevent him from succumbing to the temptation to ingest them. This holding does not conflict with In re Jeannette S. (1979) 94 Cal. App.3d 52, 59, footnote 2 [156 Cal. Rptr. 262], where the court observed that a father's alcoholism and reliance on welfare would not, by themselves, warrant a *826 finding of dependency. We do not disagree with that holding. Our conclusion here rests not on Catherine's apparent dependency on drugs or alcohol, but on her creation of a home environment providing Rocco with the means, the opportunity, and at least the potential motives to begin abusing drugs himself.
This case is also readily distinguished from In re W.O. (1979) 88 Cal. App.3d 906, 910-911 [152 Cal. Rptr. 130], where it was held that two infants could not be declared dependents based on the parents' use, and the presence in the home, of cocaine and marijuana. The court reasoned that the accessibility of the drugs to the children was no different from the accessibility, in most homes, of other hazardous substances. But Rocco is not an infant. He is old enough, on the one hand, not to sample the cleansing compounds under the sink. He is also old enough to recognize, and be tantalized by, controlled substances found lying around the house. At a time when many thousands of children Rocco's age have been seduced by the blandishments of the drug subculture as encountered at school or playground, we view with utmost seriousness a parent's turning the home into an arena where the child must contend, alone, with the choice between preserving his health and future and taking a chemical escape route. By placing drugs under his nose, setting the wrong example, and leaving him entirely to his own devices over prolonged periods of time, appellant certainly subjected him to a substantial risk that he would eventually succumb to the latter temptation. On that basis the trial court reasonably could, and presumptively did, find a substantial risk of serious physical harm.
Appellant raises no separate challenge to the dispositional order. Since the evidence warranted a finding of substantial risk of serious physical injury, it also appears to have supported a finding under section 361, subdivision (b)(1), of a substantial danger to the minor's physical health.
The order appealed from is affirmed.
Benson, J., and Peterson, J., concurred.
NOTES
[1] Except as otherwise noted, all further statutory references are to the Welfare and Institutions Code.
[2] As apparently recognized by all parties, the reference to subdivision (a) of section 300 was manifestly intended as a reference to subdivision (b). The latter is cited in the petition and in a later order of the court. The former refers to nonaccidental physical injury inflicted directly by the parent or guardian. It is manifestly inapplicable to this case.
[3] "Judicial notice may be taken of ... [¶] ... [¶] (d) Records of (1) any court of this state...."
[4] "Any minor who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court: [¶] ... [¶] (b) The minor has suffered, or there is a substantial risk that the minor will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the minor, or the willful or negligent failure of the minor's parent or guardian to adequately supervise or protect the minor from the conduct of the custodian with whom the minor has been left, or by the wilful or negligent failure of the parent or guardian to provide the minor with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent or guardian to provide regular care for the minor due to the parent's or guardian's mental illness, developmental disability, or substance abuse...."
[5] These remarks are troubling insofar as they treat section 300 as though it governed the court's ability to remove a child from the home. Indeed, both the consultant's report to the committee and the file analysis open with the statement that "[e]xisting law authorizes the removal of a minor ... from the physical custody of the parents upon a finding of abuse or neglect, among other things." (Ibid.; Assem. File Analysis of Sen. Bill No. 243 (Sept. 3, 1987), p. 1, italics omitted.) This statement is at best misleading, and at worst misstates the law as it has long existed. "A dependency proceeding under section 300 is essentially a bifurcated proceeding." (In re Jamie M. (1982) 134 Cal. App.3d 530, 535 [184 Cal. Rptr. 778].) Section 300 governs only the first phase of the proceeding, in which the question is whether the child is subject to the jurisdiction of the juvenile court. Only if the answer is affirmative does the court proceed to consider "dispositional" issues such as placement. (Ibid.; § 356; 2 Cal. Juvenile Court Practice (Cont.Ed.Bar 1981) § 15.3, p. 6.) The court's power to remove the child from the home is specifically addressed at, and limited by, section 361.
[6] Here the report acknowledges the desirability in some cases of finding jurisdiction but imposing a disposition less intrusive than removal from the home. Left unexplained, however, is the premise that such a goal can be served by amending section 300. Limitations on the juvenile court's jurisdiction necessarily restrict its ability to take any action to protect the child's welfare: if jurisdiction is not found, the matter must be dismissed. (§ 356.)
[7] Fears that the statutory revision might prevent some children at risk from being protected by the dependency system have apparently not materialized. Senate Bill No. 243, the 1987 measure enacting the provision, mandated legislative review of its implementation. (Stats. 1987, ch. 1485, §§ 54, 55, p. 5644.) A hearing held after the new statute had been in effect for nearly two years disclosed a consensus among state and county child welfare services administrators, social workers, attorneys and juvenile court judges that new law was working well. As stated by a manager of the Children's Services Bureau of the San Diego County Department of Social Services, expressing a view widely shared by those who testified, the changes in section 300 "do not seem to have left children out of the system, as was originally the fear. I think that they've come in. They've come in with more focus on the part of all parties, and [this] has helped ... social work staff in developing more specific and pertinent reunification plans for families." (Sen. Select Com. on Children and Youth, Hearing on Juvenile Court Dependency Law: Implementation of Sen. Bill No. 243 (Presley Ch. 1485 of 1987 (Dec. 7, 1990), pp. 14-15.)
[8] This rule is also compelled by the language of subdivision (b) itself, which provides in part, "The minor shall continue to be a dependent child pursuant to this subdivision only so long as is necessary to protect the minor from risk of suffering serious physical harm or illness." (§ 300, subd. (b).)