Filed 4/9/13  In re Victor H. CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re VICTOR H. et al., | B242923 |
| Persons Coming Under the Juvenile Court Law. | (Los Angeles County Super. Ct. No. CK92509) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| OLGA C., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Robert Stevenson, Juvenile Court Referee.  Affirmed.

Eva E. Chick, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and William D. Thetford, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

## INTRODUCTION

Olga C. (Mother) appeals from the jurisdiction and disposition order issued by the juvenile court pursuant to Welfare and Institutions Code section 300 et seq.[1] We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On November 2, 2011, the Department of Children and Family Services (DCFS) received an abuse hotline referral alleging general neglect of Victor H., age 11, and twins Kimberly and Melody H., age 6, by Mother. The caller reported being a neighbor of the family and seeing the children daily outside of the home unsupervised, sometimes for hours at a time. The neighbor said that sometimes their home was locked when the children came home; the neighbor would bring them food and ask if they wanted to come to the neighbor's home, but the children always wanted to remain outside. According to the neighbor, Mother was an alcoholic and spent her time hanging out with other alcoholics behind a nearby liquor store. The neighbor reported hearing Mother yell at the children and call them demeaning names.

During the ensuing DCFS investigation, children's social workers (CSWs) interviewed Mother, the children, and their father, Efrain H. (Father).[2] All of the family denied the allegations. A CSW reported that it was evident, however, that the children were left unattended without any adult supervision on numerous occasions for extended periods from approximately 30 minutes to a couple of hours.

Mother denied ever drinking alcohol and denied all the other allegations against her. She said she would only leave the children alone for a half hour. Mother admitted that she spent many hours away from home at nights, hanging out with friends who drink

---

[1] All further statutory references are to the Welfare and Institutions Code.

[2] Father is nonoffending and is not a party to this appeal.

by a neighborhood liquor store, but she denied drinking. The CSW observed Mother had slow speech, lack of full comprehension and vacant facial expressions, indicating Mother had some form of cognitive delay.

Father admitted that Mother left the children at home alone when he was at work. He denied that Mother abused alcohol or that he had seen her drink or smelled alcohol on her breath. Father acknowledged feelings of depression and that he was taking anti-depression medication that seemed to be helping.

At a Team Decision Meeting (TDM) on November 17, DCFS decided to open a Voluntary Family Maintenance (VFM) case for the family rather than to detain the children. DCFS staff determined the allegations of emotional abuse were unfounded, but the allegations of general neglect were substantiated. DCFS attempted to get Mother involved in parenting classes, mental health services and random drug testing. Mother failed to drug test and did not fully participate in the weekly meetings scheduled in her home with the In-Home Outreach Counselor (IHOC counselor)[3] as part of the Family Preservation Services.

On March 5, 2012, Mother telephoned the IHOC counselor and reported that she felt depressed and was having thoughts about harming herself. Mother said that she once ran into oncoming traffic in an effort to commit suicide, but the vehicles stopped and avoided hitting her. Mother agreed to come to the counselor's office. When she failed to show up, the counselor initiated efforts to locate her. When Mother was brought to the counselor's office, the Psychiatric (Response) Emergency Team (PET) assessed her and Mother was involuntarily hospitalized on a section 5150[4] hold for psychiatric care.

---

[3]     For clarity as to role, we will use the term "IHOC counselor," although we recognize it contains a redundancy.

[4]     Section 5150 provides: "When any person, as a result of mental disorder, is a danger to others, or to himself or herself, or gravely disabled, a . . . member of the attending staff . . . or other [designated] professional person . . . may, upon probable cause, take, or cause to be taken, the person into custody and place him or her in a facility

3

During her assessment, Mother told the IHOC counselor that she was planning to go to New York on March 8 to meet a man she had never met and then return in a couple of weeks and take the children back to New York with her. Mother said she no longer wanted Father in the home, and she told Victor she was going to have the police make Father leave. Mother told the counselor that she liked to drink alcohol and her favorite liquor was tequila. DCFS learned that Mother had been receiving her daughter's SSI check in the amount of $761.40 and spending the money buying her friends alcoholic drinks.

On March 6, Mother's treating physician at the hospital, Dr. Randhawa, telephoned the CSW and asked the reason DCFS was involved with the family. The doctor said that Mother thought it was "a joke," but after the IHOC counselor's involvement in getting Mother hospitalized, she realized it was serious. Dr. Randhawa said that Mother did not want mental health treatment, claimed there was nothing wrong with her, and said she was not thinking of hurting herself. Dr. Randhawa told Mother that she should not make statements about hurting herself, they were serious and were not taken lightly, and if she kept saying them, she could lose custody of her children. Mother reacted by laughing, not taking it seriously, and smiling like a child. Mother showed the doctor a picture of a man she said she was going to go with to New York.

Dr. Randhawa also told the CSW that Father reported he found a bottle of tequila hidden in Mother's belongings and that Mother was not really caring for the children but was going out enjoying herself. The doctor expressed concerns about Mother's ability to parent the children. The doctor said, "I am concerned but I really don't have any reason to keep her, I don't have any family members saying she has previous mental health issues and she is saying that she doesn't really want to hurt herself." The doctor said that she would probably release Mother that day or the next.

_____

designated by county and approved by the State Department of Social Services as a facility for 72-hour treatment and evaluation."

Due to increasing concerns, DCFS held a TDM on March 7. Father attended the TDM and said that Mother did not cook for the children, bathe them, get them ready for school, take them or pick them up from school. He said that she did not come home to sleep but came home at irregular times to shower, then would leave the home to return to the streets to be with her friends. Father said Mother was confrontational when he asked her any questions and he opted to avoid communicating with her. He reported that he felt depressed due to these issues and had been undergoing therapy. He expressed fear about what Mother would do in regard to the children when she was released from the hospital; he was afraid she would take them to New York. Father said he was unsure he would be able to protect the children from Mother because he worked and would not be able to be with them all the time. Father worked with DCFS to arrange a safety plan in which maternal relatives agreed to watch the children and assure they would never be left alone with Mother. Father agreed with DCFS's advisement that Mother should not be given access to the children and/or the family's home. The children were left in Father's care and custody. DCFS obtained a warrant authorizing removal of the children from Mother's custody.

Mother was released from the hospital on March 7, 2012, with a diagnosis of depressive bipolar disorder and prescriptions for medications for anxiety and psychotic disorders. When Mother's aunt arrived at the hospital to take Mother to the aunt's home, Mother told her aunt that she did not want to go, and she ran away. Mother's aunt telephoned the CSW and she said that she had looked for Mother on the hospital grounds and in adjacent apartment buildings but could not locate her.

Later that day, Father talked with the CSW by telephone. He said that he had put new door locks on the family's home that morning. Later, when no one was inside, Mother and two men entered the home through a window and, as Father and the maternal aunt arrived back at home, they saw the three of them leaving. Father said that Mother and the men had eaten the soup he had prepared for the children's meal, and Mother had taken only her belongings and documents. Subsequently, a CSW located Mother and gave her a copy of the removal order.

5

On March 12, DCFS filed a petition pursuant to section 300. The petition set forth allegations against Mother under subdivision (b) of section 300 that Mother had mental and emotional problems, including suicidal ideation and a suicide attempt, that rendered her incapable of providing regular care for the children, and that Mother placed the children in a detrimental and endangering situation by repeatedly leaving the children home alone without adult supervision.

At the detention hearing on March 12, the juvenile court found a prima facie case for detaining the children from Mother, in that the children were persons described by section 300, subdivision (b), substantial danger existed to the physical or emotional health of the children and there was no reasonable means to protect them without removing them from Mother's custody. The court found Father to be the children's presumed father and released them to Father. The court ordered DCFS to provide Family Maintenance Services to the children and Father.

In its May 3, 2012 jurisdiction/disposition report, DCFS reported that Mother was suffering from mental and emotional problems, with a diagnosis of depressive bipolar disorder, and was prescribed Ativan and Haldol when discharged from her section 5150 hold, but was not taking any medication. Mother was in denial regarding her mental health problems.

The IHOC counselor had been visiting with the family once per week since December 2011. The counselor believed the children were doing well and were safe in the care of Father. The counselor continued to work with Mother. Mother was participating in a parenting program and a substance abuse program and was on the waiting list for in-home services. The counselor reported that Mother needed to continue as an active participant in the programs in order to make her recognize the issues that were affecting her.

A DCFS dependency investigator interviewed the family members, particularly with respect to Mother's mental and emotional problems. Victor was aware that Mother told the IHOC counselor she wanted to kill herself and that Mother was hospitalized for her problems. He had heard Mother telling someone on the telephone that she wanted to

6

kill herself. Victor was concerned when Mother expressed such thoughts and would try to change the subject. According to Victor, Mother often told him that he and his sisters cared for and loved Father more than her. He said that Mother did not have patience with the children and constantly was yelling at them because they did not clean the house or his sisters were jumping on the bed. Victor said he never observed Mother taking medication. He was concerned for her well-being when she stopped coming home in the evening and stayed out until 1:00 or 2:00 a.m.; once he stayed up until she came home at 5:00 a.m.

Kimberly and Melody stated that Mother would cry when Victor did not obey her. They denied knowing anything about Mother wanting to hurt herself.

Mother denied ever being diagnosed with any mental and/or emotional problems. She felt like a normal person and did not understand why people believed she had such problems. She acknowledged saying she wanted to kill herself, but she did not have plans or thoughts on how she would do that. She stated she was hospitalized for observation and was given prescriptions for medications but never filled them. She felt perfectly fine without medication and therefore would not take any. The DCFS investigator observed Mother had difficulty expressing herself and Mother's behavior indicated that she might be suffering from some sort of cognitive delay. The investigator believed Mother would benefit from an in-depth psychological and cognitive assessment to determine any further services needed.

Father said he was not aware that Mother had any mental health issues until after her hospitalization and had not known of Mother's suicidal ideation until his meetings with DCFS staff. He never observed any behaviors by Mother that would lead him to believe she would hurt herself. Father said Mother never expressed her feelings to him.

Regarding Mother leaving the children home alone without adult supervision, Victor said that, prior to DCFS's intervention, Mother was hanging out with her friends all the time and was rarely responsible for the children. Mother had him pick up his sisters from school. When they got home, he would provide care for them. He stated that Mother would send him on the bus to buy the children's school needs and toys. Victor

7

said that, at times, his sisters were so hungry that he would make quesadillas for them or feed them cereal.

According to Victor, when Mother was away from home she was at the Laundromat, where she said she helped the owner, or she was at the neighborhood liquor store, where she waited for the people to finish their alcoholic drinks so that she could collect and recycle their cans and bottles. Sometimes Mother called Victor to come help her.

Melody denied Mother left her home alone. She said she was afraid of Victor because he called her "bad words." Initially, Kimberly denied Mother left her home alone, but later she said she did recall that Mother left the children alone when she went to work at the Laundromat and when she went out with her friends. Kimberly stated that she had seen Mother playing with friends because sometimes she and Father would go find Mother to try to get her to come home.

Mother denied ever leaving her children home alone. According to Mother, she was a good mother, she always provided good care for the children, and if she ever had to run errands, she would always take the children with her. She said she sometimes worked at the Laundromat and would take the children with her. Mother stated that there was an isolated incident a few months earlier when she left the children playing at the neighbor's house while she went to the store for about 10 minutes, and she was surprised to return home and find the CSWs had arrived and found the children alone. She added that once Kimberly had left the neighbor's house and gone back home alone, but she was alone not more than 10 minutes and was not at risk because the neighbor was next door.

Father reported that prior to DCFS's intervention, Mother often left the children alone and would leave Victor to care for his sisters. Mother put Victor in charge of picking up his sisters from school and caring for them at home. According to Father, after DCFS's intervention, Mother became more involved but gradually stopped caring for the children in the evenings and at night. Father said that every evening when he arrived home, the children were there alone, and many times the children had not been fed.

8

Regarding Mother's alcohol abuse, Victor said that he had not seen her drink, but she behaved in ways that caused him to believe she was possibly drinking. He said Mother would receive his sister's social security check and he believed Mother would use it to buy alcohol. According to Victor, Mother's behaviors never led him to believe that she was under the influence of alcohol while at home.

Melody would not comment. Kimberly denied ever observing Mother drink alcohol or being under the influence of alcohol.

Mother denied that she had ever drunk alcohol in her life or brought any alcohol to the home. She said she believed DCFS alleged she used alcohol because Mother had said that many of her neighborhood friends drank alcohol on a daily basis and they would give their cans and bottles to her because they knew she recycled them. She stated that DCFS's allegation was based on a misconception that, because the neighborhood alcoholics were her friends, she also was an alcoholic. She was adamant that she should not be judged on the basis of her friends. Mother became emotional and cried and said she hung out with her friends because she was trying to get away from Father.

Father stated that in November 2011, Mother began going out excessively and did not arrive home until late night. Mother would leave the children with him. When he asked Mother about her whereabouts, she told him she was out collecting cans. Father said he did not believe that Mother was collecting cans between the hours of 10:00 p.m. and 2:00 a.m., and he believed Mother was out drinking. He said that Mother went directly to bed when she came home and, therefore, the children never observed her under the influence. He stated that, on one occasion, he called a maternal uncle to go and get Mother from the street to bring her home, because she refused to listen to Father. Another time, her family left, but Mother stayed with several neighborhood alcoholics. He said that on several occasions, Mother smelled like alcohol. He once found a tequila bottle between her clothes and, another time, he found one right outside the door. He stated that he did not ever question Mother about whether she had been drinking in order to avoid having issues between them. He acknowledged that Mother never consumed any alcohol in the presence of him or the children.

9

The IHOC counselor stated that Mother admitted she was drinking with her friends and that she used Melody's social security check to purchase alcohol for herself and her friends.

The DCFS investigator also interviewed family members and the IHOC counselor regarding domestic violence. The children denied ever witnessing domestic violence between the parents. Mother reported that she was a victim of verbal and physical abuse by Father and that he was very controlling and possessive. She said that about two years earlier, Father grabbed her with both his hands and squeezed her throat. Victor witnessed the incident and told his teacher, but Mother denied it because she was afraid of what could happen to the family. She said that she believed Father forced her to have sexual relations while she was asleep, but she was unable to say whether Father actually hurt her or used any type of force on her. She denied the children ever witnessed such incidents.

Father denied any domestic violence. He said that he and Mother were no longer in love and that he wished to separate from her, but he remained in the relationship for his children. He had no desire to mend the relationship. Father stated that he would never do anything to hurt or harm Mother. The IHOC counselor reported that Mother said that Father had hit her on one occasion in the presence of Victor and that Father would force himself on her when she did not want to be intimate.

On May 3, 2012, DCFS filed a first amended petition. It added counts under section 300, subdivisions (a) and (b), alleging domestic violence and a count under subdivision (b) alleging Mother's alcohol abuse rendered her unable to care for the children and Father failed to protect the children from Mother's alcohol abuse. The juvenile court continued the matter for a contested hearing on June 4.

At the June 4 hearing, after admitting DCFS reports as evidence and hearing argument, the juvenile court declared the children dependent children of the court under section 300, subdivision (b). The court sustained count b-1 alleging Mother's mental and emotional problems; count b-2 alleging Mother's neglect by leaving the children alone unsupervised; and count b-3 alleging Mother's alcohol use as presenting a substantial risk that the children would suffer serious physical harm or illness. The court dismissed

10

count a and count b-4, alleging domestic violence, and struck Father from count b-2 regarding Mother leaving the children unsupervised. The court found by clear and convincing evidence pursuant the section 361, subdivision (c)(1), substantial danger existed to the physical health of the children, they were suffering severe emotional damage, and there was no reasonable means to protect them without removal from Mother's physical custody. The court ordered that the children be placed in Father's home. The court granted Mother monitored visitation, with three visits for three hours each week, with Father not to be the monitor.

In addition, the court ordered family maintenance services for the children and Father and a referral to the regional center for the children. For Mother only, the court ordered a psychological assessment, with referral to a psychiatrist if appropriate; random or on-demand alcohol testing, and if a test were missed or positive, completion of a drug program with testing and a 12-step program; a parenting program; and individual counseling to address case issues. For Father, the court ordered completion of a parenting program and use of family preservation services.

## DISCUSSION

Mother contends the evidence is insufficient to support the juvenile court's jurisdiction findings, requiring dismissal of the petition. She asserts that, therefore, the disposition order must be vacated as moot. (*In re Janet T.* (2001) 93 Cal.App.4th 377, 392.) Mother claims that, in any event, the evidence is insufficient to support the disposition findings, and the juvenile court abused its discretion in making the disposition order. (§ 361.) We disagree.

### A. *Standard of Review*

In a dependency proceeding under section 300, the juvenile court first must determine whether the child is within any of the descriptions set forth in section 300 and, therefore, is subject to the court's jurisdiction. (*In re Stephen W.* (1990) 221 Cal.App.3d

11

629, 645.)  If the court finds jurisdiction, the second determination by the court is the appropriate disposition for the child.  (*Ibid.*)

When an appellant challenges the sufficiency of the evidence supporting jurisdiction or disposition findings, we review the findings under the substantial evidence standard.  (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1433; *In re Rocco M.* (1991) 1 Cal.App.4th 814, 820.)  If substantial evidence, contradicted or uncontradicted, supports the juvenile court's findings, we must affirm the court's decision.  (*In re Rocco M.*, *supra*, at p. 820.)  "Substantial evidence" is "such relevant evidence as a reasonable mind would accept as adequate to support a conclusion; it is evidence which is reasonable in nature, credible, and of solid value."  (*In re J.K.*, *supra*, at p. 1433.)

We review the entire record in the light most favorable to the juvenile court's findings, resolving conflicts in favor of the findings, and drawing reasonable inferences from the evidence to uphold the court's decision.  (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 450-451.)  We do not "reassess the credibility of witnesses or reweigh the evidence."  (*In re S.C.* (2006) 138 Cal.App.4th 396, 415.)  "'The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record.' [Citation.]"  (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1394.)  We may affirm a juvenile court's decision if the evidence supports the decision on any ground. (*In re Jonathan B.* (1992) 5 Cal.App.4th 873, 875.)

We review the juvenile court's disposition order under the abuse of discretion standard.  "The juvenile court has broad discretion to determine what would best serve and protect the child's interests and to fashion a dispositional order accordingly.  On appeal, this determination cannot be reversed absent a clear abuse of discretion. [Citation.]"  (*In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 474; accord, *In re A.E.* (2008) 168 Cal.App.4th 1, 4; *In re Neil D.* (2007) 155 Cal.App.4th 219, 225.)

**B.  *Jurisdiction***

Section 300, subdivision (b), provides that a child comes within the jurisdiction of the juvenile court if the "child has suffered, or there is a substantial risk that the child will

12

suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child, . . . or by the willful or negligent failure of the parent . . . to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness, developmental disability, or substance abuse." In order to sustain a petition pursuant to section 300, subdivision (b), the juvenile court must find three elements: "(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the minor, or a 'substantial risk' of such harm or illness." (*In re Rocco M.*, *supra*, 1 Cal.App.4th at p. 820; accord, *In re James R.* (2009) 176 Cal.App.4th 129, 135.) "Subdivision (b) means what it says. Before courts and agencies can exert jurisdiction under . . . subdivision (b), there must be evidence indicating that the child is exposed to a *substantial* risk of *serious physical* harm or illness," and that the risk exists "*at the time of the hearing.*" (*In re Rocco M.*, *supra*, at pp. 823-824.) The substantial risk of harm required for jurisdiction under section 300, subdivision (b), is risk which arises as the result of the conduct of the allegedly offending parent. (*In re V.M.* (2010) 191 Cal.App.4th 245, 252.)

### 1. Mental and Emotional Problems

According to sustained count b-1 of the petition, the children were at substantial risk of suffering serious physical harm or illness as a result of Mother's "mental and emotional problems, including depression, suicidal ideation, and a suicide attempt, which renders [M]other incapable of providing regular care of the children. On 03/05/12, [M]other was hospitalized for the evaluation and treatment of [M]other's psychiatric condition."

There was substantial evidence that Mother had serious mental health problems. Mother was involuntarily hospitalized for psychiatric treatment and evaluation pursuant to section 5150 after Mother told her IHOC counselor that she had thoughts of harming

herself. During the hospitalization, Mother was diagnosed with depressive bipolar disorder and prescribed medications for anxiety and for psychotic disorders.

Substantial evidence supported a finding that Mother's mental health problems put the children at risk of harm. It has been held that a risk of harm cannot be presumed from the mere fact that a mother has a mental illness. (*Kimberly R. v. Superior Court* (2002) 96 Cal.App.4th 1067, 1079.) Evidence of the mother's behavior related to her mental illness must be considered. (*Ibid.*)

During Mother's hospitalization, her physician, Dr. Randhawa, told DCFS she had concerns about Mother's parenting ability. The doctor reported that Mother had laughed, smiled "like a child," and did not take the matter seriously when the doctor told Mother that she might lose her children if she continued making statements about wanting to hurt herself. Mother told Dr. Randhawa, however, that she did not have mental health problems, that she did not want any mental health treatment, and that she was not having thoughts of hurting herself. After her release, she continued denying mental health problems and did not take the prescribed medications. Mother's behavior showed a lack of appreciation for, if not actual disregard for, the possible risk her mental health problems created as to her children.

Mother admitted to a CSW and Dr. Randhawa that she had earlier attempted suicide by running into oncoming traffic. Evidence showed that Mother had expressed suicidal thoughts in the presence of at least one of the children. Victor had heard Mother telling someone on the telephone that she wanted to kill herself. Victor was concerned when Mother expressed such thoughts and would try to change the subject. Evidence supported a finding that the children remained at risk of harm in the future, in that Mother continued to deny she had any mental health problems and continued to refuse mental health treatment.

## 2. Neglect by Leaving Children Without Adult Supervision

According to sustained count b-2, the children were at risk of suffering serious physical harm because Mother routinely left them without adult supervision. Father

14

reported that Mother often left the children at home alone while he was at work. Father stated that Mother was not really caring for the children, but was going out enjoying herself. Mother did not cook for the children, bathe them, get them ready for school or take them to school or pick them up afterward. Father acknowledged that Mother initially became more involved in the children's care after DCFS intervened, but she gradually stopped caring for the children in the evenings and at night. He reported that every evening when he arrived at home, the children were there alone and many times they had not been fed.

Victor said Mother had him pick up the girls from school and when Mother was not at home; he sometimes made food for them and himself when they got hungry. Mother also had Victor ride the bus to purchase items the children needed for school. Victor reported that, before DCFS became involved with the family, Mother was hanging out with her friends all the time and was rarely responsible for the children.

Mother initially told a CSW that she would only leave the children alone for a half hour. In Mother's view, she was not leaving the children unsupervised when she left the 6-year-old girls in the care of 11-year-old Victor, or if a child was alone in the home but the neighbor was next door.

A finding of substantial physical danger from leaving children without adult supervision is proper where the children are "of such tender years that the absence of adequate supervision and care poses an inherent risk to their physical health and safety." (*In re Rocco M.*, *supra*, 1 Cal.App.4th at p. 824.) Leaving an 11-year-old boy, unsupervised, alone to care for his twin 6-year-old sisters poses an inherent risk to the physical health and safety of all three children. (See *id.* at pp. 824-825.) Whether there is a neighbor next door who knew Mother's children were alone in the family home does not eliminate the risk created by Mother leaving them unsupervised; a neighbor has no inherent duty to protect the health and safety of the children next door.

15

### 3. Alcohol Abuse

According to sustained count b-3, the children were at risk of suffering physical harm because Mother's alcohol abuse rendered her incapable of regularly caring for them. Mother argues that the evidence showed she denied drinking alcohol. She points out that Father, Victor and Kimberly[5] denied ever having seen Mother drink or appear to be under the influence of alcohol at home.

Notwithstanding the evidence Mother cites, there is ample substantial evidence in the record to support the juvenile court's finding that Mother had an alcohol abuse problem that adversely affected her ability to parent the children adequately. Although Mother initially denied drinking alcohol, later Mother told the IHOC counselor that she liked to drink, and her favorite liquor was tequila. Mother admitted hanging out with her neighborhood friends, who drank alcohol on a daily basis, behind a neighborhood liquor store. Father found a bottle of tequila hidden in Mother's belongings and another tequila bottle right outside the door.

The IHOC counselor stated that Mother admitted she was drinking with her friends and that she used her daughter's social security check to purchase alcohol for herself and her friends. Mother was aware that Victor, Kimberly and Father had seen her with her friends who were drinking alcohol.

Father reported that, when he asked Mother about her whereabouts when she left the house at night, she told him she was out collecting cans to recycle. Father said that he believed that Mother was drinking and not collecting cans when she was staying out from 10:00 p.m. to 2:00 a.m. Father said that, on several occasions, Mother smelled like alcohol. Kimberly stated that she had seen Mother playing with her friends because sometimes she and Father would go find Mother to try to get her to come home. Victor told a CSW that Mother received his sister's social security check and he believed Mother used it to buy alcohol.

---

[5] Melody did not comment in response to the CSW's questions about whether Mother drank alcohol.

16

Mother argues that such evidence was insufficient to support a finding that she abused alcohol or that the children ever suffered harm from her use of alcohol. She asserts that, for example, there is no evidence as in *In re Samkirtana S.* (1990) 222 Cal.App.3d 1475. There, the mother was found drunk in her apartment, admitted she had been drinking all day, and did not know where her children were. (*Id.* at p. 1487.) Subsequently, she left the children with a neighbor, ostensibly for two hours, but did not return or call until 12 hours later. (*Id.* at p. 1486.) Her nine-year-old son told a social worker that he had observed his mother drinking and that she had slurred speech and was sleepy. (*Id.* at p. 1488.)

Mother is correct that there was no direct evidence of intoxication. However, even if the children had never suffered harm as the result of Mother being intoxicated in the home, evidence of her being away from the home for extended periods of time each day due to her alcohol use with her friends is sufficient to support a finding that the children were at a "substantial risk" of harm or illness due to her abuse of alcohol in such a manner. (§ 300, subd. (b); *In re Rocco M.*, *supra*, 1 Cal.App.4th at pp. 823-824.)

It is irrelevant that there may be evidence to support a contrary finding, such as Father's statement that he had never seen Mother drink in the home or Mother's statement that she only hung out with alcoholic friends because she wanted to be away from Father. Our review is limited to determining if there is any substantial evidence, contradicted or uncontradicted, which supports the juvenile court's findings. (*In re Rocco M.*, *supra*, 1 Cal.App.4th at p. 820.) If there is, we must affirm the juvenile court's decision on the matter. (*Ibid.*) The juvenile court reasonably concluded that Mother's alcohol use presented a substantial risk that the children will suffer serious physical harm or illness, as a result of the failure or inability of Mother to adequately supervise or protect them.

Mother's reliance on *In re James R.*, *supra*, 176 Cal.App.4th 129 is also misplaced. In *James R.*, the court reversed a juvenile court's order declaring the children to be dependents of the court under section 300, subdivision (b), based upon the court's findings regarding the mother's alleged mental health problems and substance abuse. (*In*

17

*re James R.*, *supra*, at p. 137.) The *James R.* facts, however, are readily distinguishable from those present in this case. The mother and father had three children under the age of five. The evidence of the mother's substance abuse and its possible relation to mental health problems was that, on one occasion, she had a negative reaction from taking eight ibuprofen tablets and drinking beer. (*Id.* at pp. 131-132.) When she realized she was having an adverse reaction, she called for help and was hospitalized. She explained she was not intentionally trying to harm herself, but needed the large dose of ibuprofen for relief, in that she had built up a tolerance for acetaminophen. (*Id.* at p. 132.) The mother admitted she had postpartum depression and suicidal thoughts in the past and had been hospitalized at least five times for mental health issues. She said she had last used illegal drugs about seven years previously and had not had a drink in a while. (*Ibid.*) The mother's psychotherapist testified that she did not have bipolar disorder or suicidal tendencies, but rather had attention deficit disorder and, in his opinion, she did not pose a risk to her children and was not a danger to herself or others. (*Id.* at p. 133.) CSWs who had visited the home and interviewed family members testified that the mother had initiated and regularly participated in therapy and substance abuse treatment since the ibuprofen incident, the parents had childcare help from extended family members, and the children were safe, well cared for, and never unsupervised. (*Id.* at pp. 133-134.) One of the CSWs testified that she had never seen the mother intoxicated. (*Id.* at p. 134.)

Similarly, in *Kimberly R. v. Superior Court*, *supra*, 96 Cal.App.4th 1067, the court reviewed the sufficiency of the evidence of the mother's mental illness, bipolar disorder, as the basis for a removal order; jurisdiction had previously been established. (*Id.* at pp. 1078-1079.) The court stated, "Harm to a child cannot be presumed from the mere fact the parent has a mental illness. [Citation.] The question is whether the parent's mental illness and resulting behavior adversely affect the child or jeopardize the child's safety. [Citation.]" (*Id.* at p. 1079.) As in *James R.*, the evidence in *Kimberly R.* showed that the mother had a major mental illness, but she managed it with medication and psychiatric and psychological supervision. (*Ibid.*) The court held that the evidence was insufficient to support an order removing the child from the mother's custody. (*Ibid.*)

18

In contrast, the evidence in the instant case showed that Mother was recently diagnosed with depressive bipolar disorder, had been recently hospitalized as possibly being a danger to herself, admitted to attempting suicide in the past, daily was away from the home for extended periods visiting with her alcoholic friends, left the children at home without adult supervision while she visited friends, admitted she spent some of her daughter's social security check to buy alcohol purportedly for her friends, and had delegated her responsibility to care for the children, transport them to and from school, see that they had needed school supplies and sometimes feed them, to her 11-year-old son. The facts here bear virtually no similarity to those in *James R.* or *Kimberly R.*

## C. *Disposition*

Mother claims that the evidence was insufficient to meet the clear and convincing evidence standard required to make the disposition order removing the children from her physical custody and placing them with Father. She challenges the court's finding that the children would be "at substantial risk of harm, if returned to the care of [M]other."

A juvenile court may not order removal of the dependent child from the physical custody of the child's parent with whom the child resided when DCFS initiated the section 300 petition unless the court finds clear and convincing evidence of circumstances specified in section 361, subdivision (c).[6] Whether evidence is clear and

---

[6]     Section 361, subdivision (c), provides: "A dependent child may not be taken from the physical custody of his or her parents . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence of any of the following circumstances listed in paragraphs (1) to (5), inclusive . . . : [¶] (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody. . . . The court shall consider, as a reasonable means to protect the minor, the option of removing an offending parent or guardian from the home. The court shall also consider, as a reasonable means to protect the minor, allowing a nonoffending parent or guardian to retain physical custody as long as that parent or guardian presents a plan acceptable to the court demonstrating that he or she will be able to protect the child from future harm."

convincing "'''''is primarily a question for the trial court to determine.'''''" (*In re Mark L.* (2001) 94 Cal.App.4th 573, 580.) On appeal, we review the findings in accordance with the substantial evidence standard. (*Id.* at pp. 580-581 and fn. 5.)

The circumstances the juvenile court found applicable in the instant case were that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being" of each child if he or she returned to Mother's home, and there were no reasonable means of protecting the children without removal from Mother's physical custody. (§ 361, subd. (c)(1).) "The jurisdictional findings are prima facie evidence that the child cannot safely remain in the home" in the physical custody of the offending parent. (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917.)

Mother argues that there is no evidence that the children ever suffered harm as the result of any of her actions or conditions found to be the basis for jurisdiction and, therefore, no basis exists for removing the children from her physical custody. Evidence of past harm is not required, however, to determine removal is warranted. "A removal order is proper if it is based on proof of parental inability to provide proper care for the minor and proof of a potential detriment to the minor if he or she remains with the parent. [Citation.] The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child. [Citations.]" (*In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1136, disapproved on other grounds in *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 748, fn. 6.)

In addition, a risk of emotional harm is sufficient to justify removal under section 361, subdivision (c). (*In re H.E.* (2008) 169 Cal.App.4th 710, 721.) There was substantial evidence of a risk of emotional harm to Victor. He spoke of his anxiety due to Mother's behavior. Victor told a CSW that when Mother would start talking about hurting herself, he would try to change the subject. He knew that Mother did not come home until very late, and he stayed awake once until she came home at 5:00 a.m.

We concluded that the juvenile court's jurisdiction findings of a substantial risk of harm were supported by ample substantial evidence. In the circumstances of this case, the substantial evidence supporting any one of the three jurisdiction findings of a

20

"substantial risk" of harm to the children (§ 300, subd. (b)) constitutes substantial evidence supporting the court's disposition findings that, unless the children were removed from Mother's physical custody, there "would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being" of the children (§ 361, subd. (c)(1); see, e.g., *In re Cole C.*, *supra*, 174 Cal.App.4th at p. 917.)

Mother also challenges the juvenile court's order placing the children in Father's physical custody in his home and requiring Mother to participate in certain testing and treatment programs. As we previously stated, we review this order for abuse of discretion. (*In re Neil D.*, *supra*, 155 Cal.App.4th at pp. 224-225.)

Placement of the children in Father's physical custody in his home is expressly authorized by section 361, subdivision (c)(1), in that Father was a nonoffending parent and had developed a plan for care of the children by his relatives while he was at work. Mother moved out of the home promptly after the dependency petition was initiated. Thus, the children remained in the family home with Father, but they were protected from the conduct of Mother that presented a risk of substantial harm to them and was the basis for the jurisdiction orders.

"The goal of dependency proceedings—to reunify a child with at least one parent—has been met when, at disposition, a child is placed with a former custodial parent and afforded family maintenance services." (*In re Pedro Z.* (2010) 190 Cal.App.4th 12, 20.) If a child comes within the court's jurisdiction based upon findings against only one parent, the child remains a dependent child of the court. (*In re X.S.* (2010) 190 Cal.App.4th 1154, 1161.) Thus, in any event, the juvenile court retained jurisdiction over the children and could order Mother's removal if she attempted to move back into the family home. The juvenile court's removal order did not constitute an abuse of discretion. (See *In re Neil D.*, *supra*, 155 Cal.App.4th at pp. 224-225.)

Mother also claims the juvenile court abused its discretion, in that the evidence was insufficient to support the court's additional disposition orders that she complete on-demand alcohol testing, have a psychological assessment, with referral to a psychiatrist if

21

necessary, participate in individual counseling with a licensed therapist, and take any medication prescribed to her. Mother is mistaken.

Substantial evidence supported the findings that Mother has mental health and alcohol abuse problems, Mother's claims to the contrary notwithstanding. Requiring completion of a period of on-demand alcohol testing is reasonable in view of the evidence. The same is true of the requirement of a psychological assessment, participation in therapy and complying with medication prescriptions made in the course of the therapy. Thus, the court's order that Mother participate in these programs did not constitute an abuse of discretion. (See *In re Neil D.*, *supra*, 155 Cal.App.4th at pp. 224-225.)

## DISPOSITION

The order is affirmed.

JACKSON, J.

We concur:

WOODS, Acting P. J.

ZELON, J.