Filed 2/18/14  In re H.T. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re H.T. et al., Persons Coming Under the Juvenile Court Law. | B248150 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>PRISCILLA R.,<br><br>    Defendant and Appellant. | (Los Angeles County Super. Ct. No. CK96436) |

APPEAL from orders of the Superior Court of Los Angeles County, Terry Truong, Juvenile Court Referee.  Affirmed.

Andrea R. St. Julian, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and William D. Thetford, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

## INTRODUCTION

In this appeal, a mother of five children challenges the dependency court's jurisdictional findings as to her two older boys as well as dispositional orders as to one of these boys and the three younger boys. We affirm.

## FACTUAL AND PROCEDURAL SUMMARY

Priscilla R. is the mother of H.T. (whose father is Hu. T.), Alex W. (whose father is Alejandro W.), and K.R., Fredrick V. Jr. and Christopher R. (Fredrick V. Sr. is the father of K.R., Fredrick V. Jr. and Christopher R.).

On or about November 6, 2012, Priscilla telephoned the Los Angeles County Department of Children and Family Services (the Department), requesting the Department remove her son K. (then 10 years old) from her home "immediately," indicating he had threatened to harm her and his siblings.

The Department first became involved with the family in 1998 when a child abuse referral as to the eldest boy (H.T., about 2 years old at that time) was found to be substantiated. Over the next 14 years, the Department received another 14 referrals regarding the family—a number of which were found to be substantiated in part, while several more were found to be inconclusive (and a few others unfounded).

In October 2005, the dependency court in San Bernardino County sustained a petition alleging as to Priscilla that she had physically abused H.T. by hitting him with extension cords, phone wires and television wires, causing scarring to the backs of his legs and arms, and by hitting him with a chair and "anything that is handy"; Priscilla's drug test at Alex W.'s birth was positive for marijuana; she and Fredrick V. Sr. (incarcerated at the time of the petition) engaged in domestic violence in front of H.T., Alex and K. R.; she had a history of domestic violence with H.T.'s father Hu. T.

2

(incarcerated at the time of the petition); and she was incarcerated at the time.[1] (Welf. & Inst. Code, § 300, subds. (a), (b) and (g) [all further statutory references are to the Welfare and Institutions Code].)  In January 2006, reunification services were ordered for Priscilla (and Husani T., but no services were ordered for Alejandro W. or Fredrick V. Sr. (who had submitted a waiver of reunification services), and Priscilla later reunified with her children.

In connection with a November 2010 referral, Priscilla participated in an "up-front assessment."  At the time, K. (then 8) had been hospitalized and later discharged with a diagnosis of "impulse control disorder[.]"  Michelle Hayes, L.M.F.T., reported her diagnostic impression of Priscilla as follows:  "Axis I: Schizoaffective Disorder [¶] R/O Bipolar I with psychotic features[.]"

In September 2011, a staff member of Project Sister Family Services contacted the Department, stating Priscilla had claimed she had recently found out that "father" had been sexually abusing the children for some time.  The Project Sister staff member said Priscilla claimed she had notified the Department but the case worker said "this type of behavior is common in the Mexican community" so the case was closed, and Priscilla also said she had reported the sexual abuse to law enforcement but said the case must have been closed because no one contacted her.  "[F]ather" had reportedly moved out of the house and no longer had contact with the children, and Priscilla and the children were on a waiting list for counseling.

In late November 2011, a caller reported concern for the children after being informed Priscilla was using crack cocaine and marijuana in the children's presence and

---

[1]    As to Alejandro W., the 2005 petition alleged Alejandro "has a problem with illegal drugs which [a]ffects his ability to parent his child, Alex[ W.,]" and since on or before September 22, 2005, Alejandro "is incarcerated with an unknown release date."

As to Hu.T., the same petition alleged:  "Since on or before September 22, 2005[,] Priscilla R[.] and [Hu.] have a history of domestic violence" and Hu. "has a problem with illegal drugs which [a]ffects his ability to parent his child H[. T.]"

3

left drugs unattended and accessible to the children. The caller told the Department Fredrick Jr. had eaten some chips from a marijuana dispensary and was concerned Priscilla was not properly supervising and caring for the children. Upon investigation, the Department classified as inconclusive concerns of emotional abuse as to the four children other than H.T., but Priscilla and Fredrick Sr. had admitted to ongoing domestic violence, and she said he continued to harass her after she kicked him out of the house. About two weeks later, the Department held a team decision meeting (TDM), and Priscilla was offered and agreed to receiving voluntary services, including a mental health evaluation, all recommendations resulting from such an evaluation, participation in domestic violence counseling (individual and group) as well as drug treatment with random testing. Finding the provision of voluntary services had been successful, the Department closed the case.

Then, in May 2012, the Department received a report that K. had gotten angry with Priscilla because she would not buy him a cellular telephone; when his brother Fredrick Jr. laughed, K. responded by pushing Fredrick to the ground and "stomping on his head." Priscilla reportedly tried unsuccessfully to restrain K. When a friend arrived, the friend contacted law enforcement and placed K. on a "5585 [the Children's Civil Commitment and Mental Health Treatment Act of 1988] hold." While K. was being assessed at Arroyo Charter Oak Hospital, Priscilla said Christopher had recently told her K. had burned him with an iron about six weeks earlier. Priscilla had told the reporting party she could no longer keep the children safe from K. K. had made threats to smother his brothers with a pillow while they slept and had also threatened to kill the whole family.

In September, a mandated reporter informed the Department that K. said Priscilla had hit him in the face that morning (gesturing with a closed fist), and the reporter observed mild swelling to his lower lip with a small scrape in the same place. In the past, K. had told the reporter he was afraid of his older brothers (H.T. and Alex) who lived with his grandmother. K. said he missed her but could not visit because they would hit

4

him "very hard." He said it was worse when the older brothers visited at his mother's house and his mother was not around. The caller was also concerned that K. came to school inappropriately dressed and appeared to be emotionally disturbed, saying he would hide under his sweater whenever he had a hard time dealing with his surroundings which was often. He had also started "to exhibit self[-]harming behaviors," such as taking a pencil eraser and "rub[bing] his ankle with force" when he was very agitated and would use his pencil to "violently thrash his paper when he was angry." The caller said it was noted in school records that K. reported "hearing voices that no one else hears" that "cause him to be defiant." The caller knew K. had been prescribed Adderal (25 mg) and Abilify (5 mg), but he said he did not take them all the time. The caller said Fredrick Jr. and Christopher also exhibited defiant behaviors at school.

That same day (September 19, 2012), an emergency response social worker (Ted Masters) interviewed Priscilla. She said she had been with Fredrick Sr. (who Priscilla said had a new girlfriend and family and lived in Victorville) for 12 years. Priscilla said "her child" wakes up in the middle of the night and says, "no daddy," and said she was convinced Fredrick Sr. had molested her children. Asked about the allegations relating to K., Priscilla said K. did not have to go to school in old clothes. The social worker saw that K. had a lot of clean and neatly folded clothes in his closet and also observed the other children's clothing.

Priscilla said K. had behavioral problems and lied at school to make her look bad. She acknowledged he had been prescribed Adderal and Abilify but said she only had one pill left so she was saving it for the weekend when K. could really be out of control, and she could not get a refill until the doctor returned to work. She said K. had been diagnosed with ADHD and Fredrick Jr. was diagnosed with "mild retardation and PTSD." She said Fredrick Jr. had tried to kill himself. Tearfully, Priscilla reported that Fredrick Jr. had said, "I am going to kill myself right now." Then he stepped in front of a moving car, but the driver was able to stop in time. She said she also had heard Fredrick Jr. ask a friend, "[H]as your father ever raped you?"

5

The social worker saw the children (K., Fredrick Jr. and Christopher) arguing and fighting with one another and observed that they "blatantly ignored" Priscilla's efforts to redirect their behavior. He also witness a "heated argument" between K. and Priscilla, in which K. insisted Priscilla had hit him in the lip and she denied it.

Later in September, the social worker interviewed H.T. and Alex, who both said Priscilla "whip[ped,]" hit and kicked their younger brothers. H.T. said he got tired of seeing and going through what went on at his mother's house; he said he did not like her or anything about her and had not liked her since he was seven or eight years old; he did not want to be in the same house with her so he moved in with his maternal grandmother. Alex also said he wanted nothing to do with Priscilla. He said she was lazy and verbally and physically abusive to him and his siblings. He said Priscilla had kicked him out of the house, and he had no place to go so he came to live with his maternal grandmother.

The following month (in October), the social worker interviewed K. privately at school. He was appropriately dressed in clean clothes, had no apparent marks or bruises and did not complain of anything. K. spoke in a "rambling fashion—offering information as it occurred to him—not necessarily in chronological order." When asked if his father had molested him, K. said, "'My father did inappropriate things to me, nasty stuff. He grabbed my thing and licked it. He licked the front of my penis six times. I fought back. Then he grabbed me and choked me.'" Asked whether he had told anyone, K. said he told Priscilla, and she told Fredrick Sr. to leave and called the police. Then Fredrick Sr. "put hands on [Priscilla]," but she "punched him out." K. said Fredrick Sr. broke the window while K. was sleeping, took his stuff and left. He said his father beat him later, saying he would kill the family if K. ever told anyone what he had done to K. K. said he felt safe now because Fredrick Sr. did not know where he lived now.

K. denied doing anything "nasty" to his brothers but told the social worker his uncle Raymond—who he said lived at his maternal grandmother's house—did something to them. K. said his "uncle Raymond tried to put his hand all the way up Fred[]rick's buttocks." K. said Fredrick Jr. told K. he (Fredrick) told Priscilla but she did not know

6

what to do; "the police would only say go get them checked at the doctor's." K. said he heard Priscilla and Uncle Raymond yelling and screaming and it sounded like his uncle was kicking his mother. K. said Raymond held Christopher by the neck and threw him. K. said Uncle Raymond told Priscilla, "I'm going to do it. I swear I'll do it again." K said that is "why [we] moved. He knew I would tell."

On October 26, K., Fredrick Jr. and Christopher were all given forensic examinations. K. said when he was seven or eight years old, his father beat him, told him to pull down his pants and then "touched his private" and "licked it about six times." He said he was on his bed playing video games at the time, and his father stopped when he heard his mother's car coming. He told K. he would kill the family if he told anyone and left through a bedroom window. K. also recounted what he said had happened at his maternal grandmother's house with Uncle Raymond yelling at Fredrick Jr. who was screaming when Raymond locked the door. "Little Fred said [U]ncle Ray stuck his hand up his butt." K. said his mother had called the police and made a report.

Fredrick Jr. was uncooperative at the examination and told the interviewer he did not want to speak with her and refused to promise to tell the truth. After further conversation about the park and swings, however, he told the interviewer his uncle (Raymond) "put his finger in his (child Fred[]rick['s]) butt" when they were at the maternal grandmother's house. When he was asked whether he had ever seen his father hit his mother, Fredrick Jr. said he once saw his father almost kill his mother with a knife. "He broke the wall when he hit her and then he got a knife" from the counter. Fredrick Jr. said he punched his father, and his mother yelled, "HELP!" as she ran up the stairs and his father chased her, calling her a "nasty slut."

When Christopher was interviewed, he was "very cooperative." He said his father hit him on his arm with a stick when he was in his bedroom. His mother was there and she kicked him out of the house. She said he was going to jail for hitting Christopher. He said Priscilla spanks him with her hand, "whips him with a spoon" and hit him on the hand when she is mad at him.

On November 6 (the day Priscilla contacted the Department requesting K.'s immediate removal from her home), the social worker (Masters) spoke with Fredrick Sr. Fredrick Sr. said he had spent a year in jail for domestic violence against Priscilla. He had just been released in October, and he said he had completed anger management and counseling. He said Priscilla had a restraining order against him. When he was told of the sexual abuse allegations against him with respect to K., Fredrick Sr. said the allegations were "not true." "Priscilla is lying on me." He said she had made sexual assault allegations against him numerous times, they had been investigated and they were all lies. Fredrick Sr. said Priscilla was a chronic drug abuser with a mental health problem and she was prescribed medication. He said she "may be paranoid schizophrenic" and said the allegations were a result of her mental condition. He said the maternal grandmother was an alcoholic.

When the social worker spoke privately with H.T. and asked if he (H.T.) had been molested by his uncle Raymond. H.T. said he did not have anything to say. Asked whether his uncle had molested Alex, H.T. said he had nothing to say. He said he did not want to be around his mother, he did not like her and he did not want to live with her or have anything to do with her, but would not give a reason. H.T. said his father lived in Moreno Valley and he visited him whenever he wanted to see him, and they had a "good relationship." He said he would prefer to live with his father if he could not live with his maternal grandmother.

When the social worker spoke with Alex privately, Alex reiterated that his mother had kicked him out of the house and he did not want to return to her home. Asked if he knew anything about K. being abused by Fredrick Sr., Alex said he had heard about it, but his "gut feeling[]" was that the allegations were not true. He said Priscilla is a paranoid schizophrenic; he thought Priscilla was telling K. what to say and thought it was part of her being paranoid. Alex said he had lived with his father (Alejandro W.) the summer before, and he would rather live with his father who lives in Mesa, Arizona.

8

The next day (on November 9), the Department removed all five children from Priscilla's custody, placing H.T. and Alex with H.T.'s father and placing the younger three boys with their paternal grandmother. The Department asked the dependency court to place Alex with his father.

On November 14, the Department then filed a dependency petition, alleging that Fredrick Sr. had physically abused K., Fredrick Jr. and Christopher, H.T. and Alex; Priscilla had physically abused K., Fredrick Jr. and Christopher; both Fredrick Sr. and Priscilla had engaged in domestic violence in the children's presence; Fredrick Sr. sexually abused K. and Priscilla had a history of substance abuse, which included cocaine and marijuana use. As relevant to the issues raised on appeal, the petition alleged as to Priscilla that, on prior occasions, she had physically abused K. by striking him with objects as well as her hands and by kicking him (b-6); she had physically abused Fredrick Jr., by striking him with objects as well as her hands (b-7); she had physically abused Christopher by striking him with objects and her hands (b-8); both Priscilla and Fredrick Sr. had an unresolved history of engaging in physical alterations in the children's presence, and had hit each other (b-9); and she had a history of substance abuse, including the use of cocaine, marijuana and alcohol, which renders her unable to provide regular care and supervision of the children, and on October 5, 2012, had a positive toxicology screen for alcohol (b-10), and such physical and substance abuse endangered H.T., Alex, K., Fredrick Jr. and Christopher and placed the children at risk of physical harm. (§ 300, subd. (b) [failure to protect].)

At the detention hearing that day, Priscilla (through her attorney) indicated she was "comfortable" with H.T. (then 16) and Alex (age 14) "remaining in the care of their fathers." The dependency court found a prima facie case establishing that all five children were dependents within the meaning of subdivisions (a), (b), (d) and (j) of section 300, and for detaining the children from both Priscilla and Fredrick Sr. The court ordered 10-year-old K., 6-year-old Fredrick Jr. and 5-year-old Christopher to remain in

the home of their paternal grandmother (Olivia H.) and released H.T. and Alex to their fathers (Hu. T. and Alejandro W., respectively).

The dependency court ordered the Department to address termination of jurisdiction with custody orders in place as to both H.T. and Alex, and a pretrial resolution conference was scheduled for December 17. K. was referred for regional center services; both K. and Fredrick Jr. were to be referred for psychological assessments; and K., Fredrick Jr. and Christopher were to be assessed for counseling. The dependency court ordered referrals for individual counseling, domestic violence counseling and parenting for both Priscilla and Fredrick Sr., and both were to participate in random and on demand drug testing.

In its December jurisdiction and disposition report, the Department informed the court that when dependency investigator (Gaynelle Brown-Robinson) interviewed K., he said only Priscilla hit him and his brothers; he said Fredrick Sr. had never hit any of the children. K. said: "She would put a stick under the bed and threaten everyone with it. She would threaten us with a knife. She hits us all the time with hangers, sticks, wires. One time she put a knife up to my neck because I wouldn't sweep the floor . . . . [W]hen we were at our old house, my mom pulled a blade out on me. She put it to my throat and said if I didn't find my brother, she'd stab me." He repeated his prior statement that Priscilla had hit him in the mouth as he had "told someone at school" because "I wasn't doing my chores the right way."

K. said "things were horrible" when Priscilla and Fredrick Sr. lived together. They would fight all the time. Priscilla would steal money from his father to buy marijuana. She would hit him, slap him and tried to stab him once, K. said, but his father would always walk out the door and try to get away from Priscilla. He said Fredrick Sr. had never sexually abused him; he said his mother had told him to say Fredrick Sr. had licked his penis and rubbed it with his hands so Fredrick Sr. would go to jail. "None of that is true. . . . But my uncle Raymond did something to my brother, Fred. Fred said that he tried to stick his whole hand all the way up his butt . . . ." K. said he had never

10

seen Fredrick Sr. use drugs but that his mother used them all the time. He said Priscilla would take his brothers' urine to her drug tests, saying it was to test if they were using drugs, but that was really how she made it look like she was staying clean. "When my mom gets high, she doesn't care about us at all."

K. said he did not want to live with Priscilla; he wanted to live with his father or his grandmother. He said Priscilla "doesn't take care of us," and said he "knew a lot of things that kids my age shouldn't know. If I live with my mom, I'm afraid she's going to try to kill me."

When Fredrick Jr. was interviewed, he was "very shy and distracted and would not comment as to specifics." He would only say: "My mom was the one that told us that she wanted us to leave. H[. T.] and Alex don't like mom anymore . . . . I still like my mom." Christopher had speech issues and his speech was "nearly completely unintelligible" so he could not be interviewed.

Because all of the telephone numbers Priscilla had given the Department had been disconnected, the dependency investigator made an unannounced visit to her home where she encountered a friend of Priscilla's. The friend telephoned Priscilla and the investigator scheduled an appointment with her for the following day, but Priscilla did not appear, had not called to reschedule or cancel and did not return the investigator's calls so she could not be interviewed for the jurisdiction and disposition report. Priscilla's friend told the social worker he had known Priscilla for 20 years and did not know her to be abusive toward the children in any way. He said he had heard K. curse his mother and threaten to make false allegations about her when she could not provide the things he wanted. He said he knew Fredrick Sr. beat Priscilla; although he had not seen the abuse happen, he was often contacted by others about it and would see Priscilla's injuries afterward.

 The three youngest boys' paternal grandmother (Olivia H.) thought it "would be a shame" if the boys were returned to Priscilla again. She said the San Bernardino dependency court had placed the boys with her during the prior reunification period and

"they are so much better when they are not with their mom. She teaches them to lie." She said her son was "terrible too," she did "not condone a man hitting a woman," and his relationship with Priscilla was "toxic to say the least," but after he came out of prison, she said, Fredrick Sr. had really tried to change, "ha[d] a job and everything," and was doing much better.

Olivia H. also said that both of the two two-hour visits (held at a police station) had been "problematic." She said Priscilla insisted on discussing the allegations with the children and "tr[ied] to convince them to lie on their father as well as [Olivia, the paternal grandmother]." At the most recent visit, Priscilla had cursed and yelled at the children and told K. he would not be allowed to return home but his brothers Fredrick Jr. and Christopher would; Priscilla also continued to try to convince the children that they "were/are afraid of their father." In addition, Olivia said, Priscilla accused her (the paternal grandmother) of molesting the children. She said Priscilla gave K. a prepaid cellular telephone and told him to take pictures of Olivia's house and send them to Priscilla. Olivia said the children's behavior was "out of control after visits with their mother in that they curse, fight and call[] her nasty names[, and we]re far more calm and responded better to structure" when they were not in contact with Priscilla." She again asked not to continue as monitor for Priscilla's visits; she said Fredrick Sr. visited with the children for a couple of hours once or twice a week, and these visits were without incident.

The Department noted Olivia H. provided the three younger boys with "appropriate supervision and structure" and was "patient" in helping them adjust to their new environment. She lived in a quiet residential neighborhood, and her single family home was very organized, clean and comfortable; each child had his own bed, with ample space for personal belongings.

Regarding H.T. and Alex and their release to their respective fathers at the detention hearing, the dependency investigator (Brown-Robinson) noted "some concerns" based on the fact the family had an open case in San Bernardino County with

12

dependency proceedings in which Hu. T. and Alejandro W. were originally provided with reunification services, but at case disposition, the court ordered no reunification services for Alejandro, and Husani did not participate in the case plan for services.[2] Further, she stated, neither father had made himself available to the Department and maintained "little if any contact" with his son. In addition, Alejandro had been incarcerated on drug-related charges and there was no indication he later complied with any court orders or completed any programs or services, and Husani was arrested for domestic violence in 1998 and 2001 with no indication he had completed any domestic violence programs. Thus, she said, "further investigation is needed in order to determine [each] parent's ability to parent and ensure the child(ren)'s safety and well being. The court will be further notified."

On February 4, 2013, four social workers with the Department (Masters, Darlene Myles, Marva Butler and Cynthia Coleman) sought a restraining order against Priscilla because she had threatened to kill them. The dependency court granted a temporary restraining order. On February 15, 2013, Dalila Sandoval (the social worker to whom Priscilla had made the threats against Masters, Myles, Butler and Coleman) testified and indicated that she had not been in fear at the time, but it did "alarm" her with respect to the four social workers Priscilla named as said she would "make them pay and would kill them if she could." Rather than issuing a restraining order, the dependency court issued a "stay-away order" requiring Priscilla to stay at least 100 yards from the homes, schools, workplaces, vehicles and places of worship of the four social workers she had threatened and prohibiting her from contacting them by phone, email, text message or similar means. Also, the dependency court ordered that Priscilla's visits would no longer take place at the Department's Pomona office; instead, her visits were to take place at a neutral

_____

[2]    With respect to the 2005 case in San Bernardino County, the Department later noted jurisdiction had been terminated in 2008, with Priscilla successfully reunified with H. T., Alex and K.

location or police station, and she would have to provide her own monitors for visits to take place.

In its supplemental jurisdiction and disposition report filed in March, the Department provided statements from Alex, Priscilla and Fredrick Sr. When he was interviewed regarding the allegations in the dependency petition, as to most of them, Alex said, "No, those are all really old things that happened when we were taken the [first] time."

Regarding the allegations of domestic violence between Fredrick Sr. and Priscilla, however, Alex said, "Yes, that happened, but I only saw them fight in front of us once. They would always argue and they would hit each other. Mostly, it was my mother that started it. She'd get mad for no reason and instigate things for no reason." As to the sexual abuse allegations against Fredrick Sr. involving K., Alex said: "Yeah, I heard about that with the ER worker. I don't believe any of that happened. None of that is true and Fred[]rick is not that kind of person. I don't believe he'd ever do anything like that. K[.] never shared any of that with me and I know that if something like that happened to him, he would have told. I think that is all lies." With respect to the substance abuse allegations against Priscilla, Alex said he knew his mother drank "occasionally" and "smokes marijuana a lot," but he had not seen and did not believe she used any other drug.

Priscilla said that after she was charged with willful cruelty, she "never whipped [her] kids again." She said K. got the laceration on his lip from fighting with Fredrick Jr. She said she had never physically abused Fredrick Jr. or Christopher, and said she never knew Fredrick Sr. abused her kids; her kids knew she would never let anyone hurt them. "The ER worker [Masters] is gay and that's why he took my kids. He laughed at me." She said she tested positive for drugs in 2011 because Fredrick Sr. was a drug dealer, they were fighting all the time and he was putting drugs in her food. She was going to Pomona Drug and Alcohol Recovery Program and domestic violence counseling at House of Ruth, but "didn't finish." She said "ER was waiting for a chance to take my

14

kids from me. There was no reason to take the older 2 children because they weren't even with me at the time. They were with their [maternal] grandmother."

She said she "ha[d not] smoked weed since about 30 days ago." She said she had a current medical marijuana card "due to my depression and anxiety." She also said she had experimented with cocaine and PCP for about six months in 2000, but relapsed into drug use because Fredrick Sr. "made [her] feel afraid." "The last time I used cocaine was 2011 and after the disclosure of sexual abuse of the kids I didn't know how to deal with it."

Regarding the sexual abuse allegations involving Fredrick Sr. and K., Priscilla said: "So when you go to the police department and you file a police report when you find out, it's not protecting your kids?" She said she had gone to the police department twice to make a report, but the police said the "kids were too small and they wouldn't talk." The ER worker was not able to get a disclosure either, and when the children went to Project Sister, Priscilla said, "they said if I kept reporting sexual abuse, everyone was going to think I was lying."

Regarding her own mother (with whom H.T. and Alex had been living prior to their detention), Priscilla said she was a substance abuser who "drank alcohol and used drugs daily." She said her own childhood was "very sad," reporting that her mother's boyfriend molested her when she was 6 or 7 but her mother did not believe her and instead yelled at her, blamed her and visited the same man in jail. Priscilla said her primary caretaker had been her grandmother, but she had died in 2000. As a child, she said, she once found a drug pipe and a bottle of Thunderbird alcohol in her backpack at school because her mother had tried to hide it there.

According to the Department's report, Priscilla "described a good relationship with [Alejandro]" that lasted about three years, but at the same time said he was "insanely jealous" and physically abusive. Priscilla was "unaware as to whether or not [he] used any drugs" but said he sold them. The dependency investigator (Brown-Robinson) reported that "throughout the interview, [Priscilla] was not in control of her emotions that

15

varied between laughing, joking and crying. Additionally, [she] answered questions/responded to the [dependency] petition using different voices consisting of different accents including a British accent and a voice that resembled that of the devil or a possessed person. [Priscilla] presented as very unstable with dramatic and unpredictable mood swings as well as paranoia."

Fredrick Sr. (age 43) said he had experimented with marijuana as a teenager but it made him paranoid so he never used it again. He admitted he had a criminal history, beginning with a 1992 conviction for possessing a concealed weapon for which he spent one year in prison. He said he also had two other short prison terms resulting from parole violations. Then in 2010, he said he was convicted of domestic violence and battery on a spouse or cohabitant (Priscilla) and served another year in prison. After his release in 2011, he remained on parole but was scheduled to be discharged from parole in March 2013. He said he worked full-time at Henkley Solar Plant in Barstow and participated in weekly parenting education classes and anger management classes with Family Systems Management. Fredrick Sr. said he was "a changed man now" and was "much more calm." He said he was "learning a lot" in the classes he was taking. He said he was "very close to his mother" and had "fond memories of his childhood when he chose to listen to [her]," indicating she was his "main support system."

Alejandro W. (also 43) was home after suffering both a heart attack and stroke "fairly recently" and had difficulty speaking, but he discussed his family history and background with the social worker and told her he had been married for a year and had two girls, ages 10 and 11. He denied any issues with alcohol or drugs; he said he was receiving disability at the time. When the Department interviewed Alejandro in February, he said he had tried to get custody of his son Alex but Priscilla "told them that I was smoking weed and I tested positive so she won full custody." After that, he said, he stayed in contact and visited Alex when Alex was at Alejandro's mother's house. "I took care of him too. I bought his clothes, medicine and whatever he needed."

16

The Department reported that Priscilla's monitored visitation with the three younger boys remained on hold because the monitors she had enlisted from her church were only available on Sundays and the paternal grandmother was only able to transport the children after school on weekdays and on Saturdays. Alex and H.T. were in contact with Priscilla by telephone; Alex said she called him "occasionally with no particular frequency."

Because the Department had been unable to contact H.T. or his father, the Department deferred its recommendation regarding H.T., but as to the four boys other than H.T., the Department recommended that the dependency court sustain the petition and declare all four boys dependents as follows: removing Alex from Priscilla's physical custody and placing him with his father Alejandro W. pursuant to a custody order granting Alejandro sole physical custody and joint legal custody to both parents, with monitored visitation for Priscilla in a neutral location, monitored by Alejandro or his wife (Jennifer W.); and as to K., Fredrick Jr. and Christopher, removing these three children from Priscilla's custody and ordering reunification services for Priscilla and Fredrick Sr. The Department noted Fredrick Sr.'s expressed desire to assume custody of the children, but noted Fredrick Sr.'s recent conviction and prison time served for spousal battery against Priscilla as clear and convincing evidence that placement with him at that time would be detrimental to the children; the Department acknowledged Fredrick Sr.'s participation in a treatment program and enrollment in parenting education and anger management classes and parole status, recommending that Fredrick Sr. complete the conditions of his parole as well as his parenting education and anger management classes before the children were released to his care.

At the contested adjudication and disposition hearing on March 12, 2013, in addition to submitting its reports as evidence, the Department presented K.'s testimony (in chambers). K., then 10 years old, testified he had told social worker Ted Masters that his father had "grabbed [his] thing and licked it," meaning his "private part," but then said "my dad never touched me." He testified at the hearing that he had previously told

17

the social worker his father had done "nasty stuff" to him because his "mom was telling [him] to say it." He acknowledged making each of the statements the Department had reported (that Fredrick Sr. had "licked the front of [his] penis six times"; that he (K.) "fought back" but Fredrick Sr. "grabbed" and "choked" him; and that he told his mother "about that"), but testified: "No, I didn't tell my mom that. She made me say it." Then, she called the police and reported it.

Asked about his statement to Masters that Fredrick Sr. put his hands on his mother and she punched him out, K. testified: "My mom hurt my dad mostly." He said she "punched him, bleached all his clothes, took his money." He said he had seen his mother try to stab his father with a knife; in response, he said his father took the knife, put it down and walked out the door. On another occasion, K. testified he saw Priscilla hit Fredrick Sr. in the elbow with a baseball bat, causing a "bump." That time too, he said, his father "walked out the door." K. was unsure exactly how many times he had seen his parents fight, approximating "[a]bout twelve times." It made him "sad." K. testified his mother had hit him 11 times, using "wires, a broom[--a]ll kinds of things." He said she had hit him in the mouth over doing his chores and had kicked him once or twice. He testified he had seen Priscilla hit Fredrick Jr. with a big plastic spoon and said she hit Christopher on his butt with a spoon or her hand; he had seen her hit Alex also. He had seen his mother use a "pipe, weed and all that." He said he and his brothers had seen her use marijuana "a lot" his "whole life." She would use it in "a little tube" K. described as "silver" "[o]r a pipe or a blunt." She also drank "clear" alcohol in front of him.

K. testified Priscilla was "different" when she used drugs and alcohol; she would call people up and have parties when K. and his brothers had school the next morning. He said he had seen Priscilla use cocaine once, describing it as "white and flat like sand." According to K.'s testimony, Priscilla would sell it from the car.

Regarding his father, K. testified he was not lying at the hearing to make Fredrick Sr. look better, and he said if someone was touching him, he would say so. He said he had not wanted to lie about his father touching him before, but his mother told him to say

18

it to keep him away from his dad, and she said if he did not say what she told him to say, he would "get beat up"—she would "hit him a lot." He was afraid of her, and "d[id]n't want to get beat up," so he lied. He had been visiting with his father, and it made him "kind of happy." K. said he was not afraid of Fredrick Sr. and would feel safe if he (or his brothers) were to be alone with him without his grandmother there. K. had not seen his father get into any physical fights with any other women. He had not seen Fredrick Sr. use drugs. K. testified he wanted to live with dad, not with Priscilla. "I don't want to live with my mom just to get beat up, no."

Priscilla's counsel argued K. was not credible and asked the dependency court to strike all of the allegations against Priscilla, amending only the allegation regarding her history of substance abuse (b-10) to conform to proof.

The dependency court found true (as amended to conform to proof) the allegations pursuant to section 300, subdivision (b), that Priscilla had physically abused K. ((b)(6)); Fredrick Jr. ((b)(7)), and Christopher ((b)(8)); that she and Fredrick Sr. had an unresolved history of engaging in physical altercations in the children's presence and had hit each other ((b)(9)); and she had an unresolved history of substance abuse, including cocaine, marijuana and alcohol, which rendered her unable to care for the children, and had a recent positive toxicology screen for alcohol in October 2012 ((b)(10)) and such conduct placed the children at risk of harm.[3] The five children were declared dependents under

---

[3] "On prior occasions, the children H[.] T[.], Alex[] W[.], K[.] R[.], Fred[]rick V[.], Jr., and Christopher R[.]'s mother, Priscilla R[.], physically abused the child K. by striking the child with objects in [her] hands [and she] kicked [K.] Such physical abuse of the child by the mother endangers the child's physical health and safety and places the child and the child's siblings . . . at risk of physical harm. [(b)(6)]

"On prior occasions, the children['s] mother, Priscilla R[.], physically abused the child Fred[]rick by striking the child with objects in [her] hands. Such physical abuse of the child by the mother endangers the child's physical health and safety and places the child and the child's siblings . . . at risk of physical harm. [(b)(7)]

the same subdivision, with the dependency court finding by clear and convincing evidence there was a substantial danger to their physical health, safety, protection or physical or emotional well-being, and there were no reasonable means by which their physical health can be protected without removing them from their parents' physical custody.

The court ordered H.T., Alex, K., Fredrick Jr. and Christopher removed from Priscilla's custody.

The court found H.T.'s father Hu. T., the parent with whom he had not been residing, desired custody of H.T. and that placement with Hu. T. would not be detrimental to H.T. so H.T. was ordered placed with his father, with a progress hearing set for April 26 (in lieu of terminating jurisdiction at that time as Hu. T. had requested).[4]

---

"On prior occasions, the children['s] mother, Priscilla R[.], physically abused the child Christopher by striking the child with objects in [her] hands. Such physical abuse of the child by the mother endangers the child's physical health and safety and places the child and the child's siblings . . . at risk of physical harm. [(b)(8)]

"On prior occasions, the children['s] mother, Priscilla R[.], and Fred[]rick V[.], Sr., father of the children K[.], Fred[]rick [Jr.], and Christopher, have an unresolved history of engaging in physical alterations in the children's presence. On prior occasions[, Priscilla and Fredrick Sr.] hit each other. Such conduct by [Priscilla and Fredrick Sr.] places the children at risk of harm. [(b)(9)]

"The children['s] mother, Priscilla R[.], has an unresolved history of substance abuse, including use of cocaine, marijuana and alcohol, which renders [her] unable to provide regular care and supervision of the children. [¶] On October 5, 2012, [Priscilla] had a positive toxicology screen for alcohol. Such unresolved history of substance abuse by the mother places the children at risk of harm. [(b)(10)]"

[4] In the Department's reports for the hearing, the social worker said she was unable to interview Hu. and H. T. despite her efforts to call two specified telephone numbers. At the hearing, however, Hu.'s counsel informed the dependency court that the social worker said she had tried to contact Hu. at two telephone numbers other than the one Hu. had provided to the dependency court at the outset of the proceedings (and to his counsel). (The court and counsel then conferred off the record.)

20

Hu. T. was to comply with family maintenance services to include announced and unannounced visits. Similarly, the court found Alex's father Alejandro W., the parent with whom Alex had not been residing, desired custody of Alex and that his placement with Alejandro would not be detrimental so Alex was ordered place with his father as well.[5] As to Alex, the dependency court terminated its jurisdiction with a custody order providing for sole legal and physical custody to Alejandro W. as he had requested (with the order to be provided to the court by the following day), with monitored visitation for Priscilla at a minimum of two hours per month; however, Priscilla was ordered to complete individual counseling, parenting and anger management prior to reunifying with Alex.

For K., Fredrick Jr. and Christopher, the dependency court ordered the care, custody, control and conduct for these children to be placed under the Department's supervision for suitable placement, with reunification services ordered for both Priscilla and Fredrick Sr. Priscilla was to receive parenting, individual counseling and anger management, and monitored visitation at a minimum of four hours per week, with the Department permitted to exercise its discretion to liberalize visitation. For Fredrick Sr., the dependency court ordered Fredrick Sr. to complete his anger management classes (he said he had 18 classes remaining) to address the case issues, with unmonitored visitation (and the Department had discretion to liberalize visitation for him as well). If the paternal grandmother was agreeable, Fredrick Sr. could have overnight visits with the

---

Also, when counsel for Hu.T. and Alejandro W. each requested termination of jurisdiction with family law custody orders in place for Hu.T. and Alejandro W. with respect to H. T. and Alex, respectively, counsel for H. T. and Alex said she had no objection to closing the case with a family law order as to Alex but said she had not been able to speak with H. T. regarding Hu.T.'s request for H. T.'s placement with him.

[5] Alejandro W.'s counsel informed the court he was not present because he had an upcoming medical procedure for receipt of a pacemaker.

21

children in her home.  Individual counseling was ordered for K., Fredrick Jr. and Christopher (who was to receive speech therapy as well).

A six-month review hearing was scheduled for September 10.

Priscilla appeals.[6]

---

[6]     We requested and received subsequent minute orders in this case.  Pursuant to Evidence Code sections 452, subdivision (d), and 459, subdivision (a), we take judicial notice of these orders, dated March 13, April 26, September 10, October 31, November 7, December 3, and December 20, 2013, as well as the order dated January 31, 2014.  (*In re C.C.* (2009) 172 Cal.App.4th 1481, 1487, fn. 3.)

The March 13, 2013 order corrected the March 12 order nunc pro tunc to reflect the actual proceedings of March 12 (as stated above and as addressed in the briefing), and to add H. T., K., Fredrick J. and Christopher to the April 26 calendar in order to amend the case plan to specify that Priscilla was ordered to participate in a drug treatment program and drug testing.

On April 26, 2013, the dependency court found that H.T. was safe in his father's custody and that further court jurisdiction was unnecessary.  The dependency court terminated jurisdiction as to H. T. (who will be 18 in March 2014), awarding Hu.T. sole physical custody, with Hu. and Priscilla R. to share joint legal custody and with Priscilla to have visitation of no less than four hours per week.  The order was stayed for five days to allow for the submission of the custody order, and there is no further mention of H. T. in the minute orders thereafter.  (The March 12, 2013 case plan was also amended to specify that Priscilla R. was to participate in a drug rehabilitation program with weekly random and on demand testing, and pursuant to Priscilla's motion, she was appointed new counsel.)

On September 20, 2013, it was noted that "Title XX's [are] due 10-28-13," and the matter was continued to October 31.  According to the minute order for that date, the dependency court had received the Department's further report as well as "Title 20's from 4/1/13 through 10/30/13."  Fredrick V. Sr. had received certificates of completion of a "52[-]week domestic [violence, sic] program" and an anger management program.  His three sons, K. R., Fredrick V. Jr. and Christopher R. were released to Fredrick Sr. on a home-of-parent order with Department supervision.  (The order was stayed until November 7 pending confirmation of receipt of Fredrick Sr.'s certificates, and on November 7, the stay was lifted.)

On December 20, 2013, the matter was on calendar (continued from December 3) regarding the possibility of transfer to San Bernardino County where the three younger boys lived with their father.  Over Priscilla's objection, the matter was transferred to San

22

## DISCUSSION

Preliminarily, we note that, "As a general rule, an order terminating juvenile court jurisdiction renders an appeal from a previous order in the dependency proceedings moot. [Citation.] However, dismissal for mootness in such circumstances is not automatic, but 'must be decided on a case-by-case basis.' [Citations.] 'An issue is not moot if the purported error infects the outcome of subsequent proceedings.' [Citation.]" (*In re C.C.* (2009) 172 Cal.App.4th 1481, 1488.) An appeal may also become moot when the occurrence of an event renders it impossible for the appellate court to grant the relief requested; again, however, the question of whether subsequent events have rendered an appeal moot and whether the reviewing court's decision may affect the outcome of the case in subsequent proceedings is reviewed on a case-by-case basis." (*In re Esperanza C.* (2008) 165 Cal.App.4th 1042, 1054-1055.)

In this case, the dependency court has terminated its jurisdiction as to two of Priscilla's five children (H.T. and Alex W.). (Also, as to the three younger boys, subsequent to the jurisdictional findings and dispositional orders from which Priscilla appeals, the dependency court has since returned the younger boys (K. R., Fredrick V. Jr., and Christopher R.) to their father's custody, subject to the Department's supervision pursuant to a home-of-parent order, and the matter has since been transferred to the San Bernardino County court.) Under the circumstances of this case and because dismissal of the appeal operates as an affirmance of the underlying judgment or order (*In re Jasmon O.* (1994) 8 Cal.4th 398, 413), we consider the merits of Priscilla's appeal. (*In re C.C., supra,* 172 Cal.App.4th at pp. 1488-1489.)

---

Bernardino, and the minute order dated January 31, 2014, indicates the transfer was confirmed by verification with the transfer desk.

23

**Substantial Evidence Supports the Dependency Court's Jurisdictional Findings as to H.T. and Alex W.**

*Subdivision (b) of section 300 and the Standard of Review.*

In reviewing the jurisdictional findings and dispositional order, we look to see if substantial evidence, contradicted or uncontradicted, supports them. (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193.) If there is any substantial evidence to support the findings of the dependency court, we must uphold those findings on appeal. (*In re Basilio T.* (1992) 4 Cal.App.4th 155, 168.)

As relevant, subdivision (b) of section 300 provides for dependency jurisdiction of any child who "*has suffered, or there is a substantial risk that the child will suffer, serious physical harm* or illness, as a result of [(1)] *the failure or inability of his or her parent or guardian to adequately supervise or protect the child*, or [(2)] the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left, or [(3)] by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment, *or* [(4)] *by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse. . . .*" (§ 300, subd. (b), emphasis added.)

In Priscilla's view, because H.T. and Alex were living in their maternal grandmother's home, they "simply were not at substantial risk of serious harm." She says "the only facts alleged in the sustained petition and introduced at the adjudication hearing were that Priscilla had a history of drug use, mental health issues, domestic violence with a former partner and that she had physically abused her youngest three children. Nowhere in the record was there evidence that Priscilla's history placed her older two children, H[.T.] and Alex[], at substantial risk of serious harm."

Citing *In re Destiny S.*(2012) 210 Cal.App.4th 999, 1003, she says the use of illicit drugs, *without more*, does not bring a child within the jurisdiction of the dependency

court. (Cf. *In re Destiny S.* at p. 1004 ["There is no evidence in this case that Mother's drug use caused her to neglect Destiny. On the contrary, Destiny had her own bedroom "which was nicely decorated," no drug paraphernalia was observed in the home . . . . It was also undisputed that Destiny has "no behavioral or discipline issues" . . . and wanted "to go back with [her] mom"].) Citing *In re David M.* (2005) 134 Cal.App.4th 822, 828, she says the fact a parent suffers from mental illness cannot, *by itself*, be a basis for jurisdiction. Even in cases where physical abuse is directed at another individual in the child's home, she says, under *Daisy H.* (2011) 192 Cal.App.4th 713, 717, such violence must be shown to have a sufficiently ill effect on the child so as to place him or her at significant risk of substantial harm before the court may take jurisdiction.

The problem is that Priscilla ignores the record which provides the nexus (found to be lacking in the cases she cites) between Priscilla's conduct and the risk of harm to H.T. and Alex. (*In re Rocco M.* J(1991) 1 Cal.App.4th 814, 824.) "[T]he question under section 300 is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm." "Cases finding a substantial physical danger tend to fall into two factual patterns. One group involves an identified, specific hazard in the child's environment--typically an adult with a proven record of abusiveness." (*Ibid.*)

In this case, although years had passed since the dependency court (in October 2005) sustained the prior petition filed in San Bernardino County, finding true the allegations Priscilla had physically abused H.T. (then 9 years old) by hitting him with extension cords, phone wires and television wires causing scarring to his back and arms and by hitting him with a chair and "anything that is handy" (and had a positive drug test at the time of Alex's birth, and engaged in domestic violence in her children's presence), the evidence before the dependency court at the time of the March 2013 adjudication and disposition hearing was that Priscilla's conduct with respect to her children had not changed. "[E]vidence of past conduct may be probative of current conditions[.]" (*In re Rocco M, supra,* 1 Cal.App.4th at p. 824.) Here, when H.T. and Alex were interviewed in September 2012, they both told the social worker Priscilla "whip[ped,]" hit and kicked

their younger brothers; Alex said Priscilla had physically abused him and had kicked him out of the house so he went to live with his maternal grandmother because he had no place to go; and similarly, H.T. said he did not want to see what (still) went on at his mother's house or go through what was happening there so he moved in with his maternal grandmother.

It is true that "the fact that a child has been left with other caretakers will not warrant a finding of dependency *if the child receives good care*." (*In re Rocco, supra,* 1 Cal.App.4th at p. 824.) First, we note it was not the case that Priscilla provided for the two older boys' care by making alternate arrangements for them with the maternal grandmother. To the contrary, the two boys were no longer in Priscilla's home only because Priscilla had "kicked [Alex] out" of her house so he had no place else to go and H.T. did not want to go through what went on at his mother's house. Meanwhile, Priscilla *continued* to physically abuse K., Fredrick Jr. and Christopher, *continued* to neglect her children as a result of her unresolved substance abuse and *continued* to engage in physical altercations in her children's presence, demonstrating herself to be the type of "specific hazard in the child's environment" discussed in the *Rocco M.* case— "typically an adult with a proven record of abusiveness." (*In re Rocco M., supra,* 1 Cal.App.4th at p. 824.)

Furthermore, according to K.'s statements to the social worker, H.T. and Alex would come to Priscilla's house when she was not there, and hit K. "very hard," while Priscilla (and the maternal grandmother) failed to provide any supervision. K. testified to Priscilla's drug use in the children's presence, and Priscilla herself told the social worker the maternal grandmother was a "substance abuser" who drank alcohol and used drugs every day. Moreover, although the dependency court did not allow further questioning in this regard at the hearing, according to the children's statements in the Department's reports, the evidence supported the conclusion the children were *not* well cared for in the maternal grandmother's home, but rather were also at risk of abuse there—not only because the evidence showed Priscilla visited at her mother's home but also because the

26

boys said their Uncle Raymond had physically and sexually abused Fredrick Jr. there. (*In re Rocco, supra,* 1 Cal.App.4th at p. 824; *In re Destiny S.* at p. 1004, italics added ["There is no evidence in *this* case that Mother's drug use caused her to neglect Destiny. On the contrary, Destiny had her own bedroom "which was nicely decorated," no drug paraphernalia was observed in the home . . . . It was also undisputed that Destiny has "no behavioral or discipline issues" . . . and wanted "to go back with [her] mom"]; and see *In re Heather A., supra,* 52 Cal.App.4th at p.194 ["domestic violence in the same household where children are living is neglect; it is a failure to protect [the children] from the substantial risk of encountering the violence and suffering serious physical harm or illness from it. Such neglect causes the risk"].)

The dependency court "provides the state a forum to 'restrict parental behavior regarding children, . . . and . . . to remove children from the custody of their parents or guardians.' [Citation.] When, as in this matter, a juvenile court hears a dependency case under section 300 of the Welfare and Institutions Code, the court deals with children who have been seriously abused, abandoned, or neglected. The [dependency] court has a special responsibility to the child as *parens patriae* and must look to the totality of a child's circumstances when making decisions regarding the child. (*In re Roger S.* (1992) 4 Cal. App. 4th 25, 30-31 [5 Cal. Rptr. 2d 208] (*Roger S.*).)" (*In re Chantal S.* (1996) 13 Cal.4th 196, 201.)

Accordingly, on this record, we conclude the dependency court's jurisdictional findings are supported by substantial evidence. (*In re Heather A., supra,* 52 Cal.App.4th at p. 193; and see *In re Carlos T.* (2009) 174 Cal.App.4th 795, 806 ["The question to be asked in such a case is whether, in the absence of the state's intervention, there is a substantial risk that the child will be abused"].)

**Substantial Evidence Supports the Dependency Court's Disposition Orders as to H.T. and Alex W.**

Priscilla says substantial evidence does not support the determination H.T. and Alex would be at substantial risk of serious harm if placed in her care. We disagree.

27

*Section 361 and the Standard of Review.*

Pursuant to section 361, "A dependent child may not be taken from the physical custody of his or her parents or guardian or guardians with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence of any of the following circumstances listed in paragraphs (1) to (5), inclusive, and, in an Indian child custody proceeding, paragraph (6):

"(1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody. . . . The court shall consider, as a reasonable means to protect the minor, the option of removing an offending parent or guardian from the home. The court shall also consider, as a reasonable means to protect the minor, allowing a nonoffending parent or guardian to retain physical custody as long as that parent or guardian presents a plan acceptable to the court demonstrating that he or she will be able to protect the child from future harm." (§ 361, subd. (c)(1).)

We review the dependency court's disposition order for substantial evidence. (*In re Heather A., supra,* 52 Cal.App.4th at p. 193.)

Citing *In re Rodger H.* (1991) 228 Cal.App.3d 1174, 1182-1183, Priscilla says "where there are no facts upon which a petition can be sustained then there can be no facts on which to base disposition." According to Priscilla, "[she] ensured that [H.T. and Alex] were well taken care of by their maternal grandmother." Because we conclude the jurisdictional findings as to H.T. and Alex W. were supported by substantial evidence (as addressed in the preceding discussion) and her claim to have "ensured" that her older sons were "well taken care of by their maternal grandmother" is contradicted by the record, Priscilla's challenge to the dependency court's disposition orders on the same ground necessarily fails.

28

**Priscilla Has Failed to Demonstrate an Abuse of Discretion in the Dependency Court's *Legal* Custody and Visitation Orders as to Alex.**

As Priscilla notes: "When a juvenile court terminates its jurisdiction over a dependent child, it is empowered to make 'exit orders' regarding custody and visitation."[7] (*In re T. H.* (2010) 190 Cal.App.4th 1119, 1122-1123, citing (§§ 364, subd. (c), 362.4; *In re Kenneth S., Jr.* (2008) 169 Cal.App.4th 1353, 1358.) Under this authority, she says the dependency court's "orders of *legal* custody and visitation were contrary to Alex's best interest and thus, they must be reversed."[8] (Italics added.) We disagree.

---

[7] As relevant, section 362.4 provides: "*When the juvenile court terminates its jurisdiction over a minor who has been adjudged a dependent child of the juvenile court prior to the minor's attainment of the age of 18 years, and* proceedings for dissolution of marriage, for nullity of marriage, or for legal separation, of the minor's parents, or proceedings to establish the paternity of the minor child brought under the Uniform Parentage Act, Part 3 (commencing with Section 7600) of Division 12 of the Family Code, are pending in the superior court of any county, or *an order has been entered with regard to the custody of that minor, the juvenile court on its own motion, may issue* a protective order as provided for in Section 213.5 or as defined in Section 6218 of the Family Code, and *an order determining the custody of, or visitation with, the child. . . .*" (Italics added.)

[8] The Department notes it had recommended that the Priscilla and Alejandro have joint legal custody of Alex and had not proposed specific terms regarding the frequency or duration of Priscilla's monitored visitation; therefore, it takes no position on this issue. In her reply brief, Priscilla says the Department has mischaracterized her argument, claiming she has "very pointedly challenged the award of *physical* custody to Alex's father," citing her arguments that substantial evidence does not support the jurisdictional findings and dispositional orders as to H. T. and Alex as well as her challenge considered in this section—in which she expressly claims the dependency court abused its discretion in the award of Alex's *legal* custody to Alejandro. (Italics added.) We have already addressed and rejected Priscilla's challenges to the dependency court's jurisdictional and dispositional orders as to Alex. To the extent she claims her challenge to the dependency court's award of *legal* custody to Alejandro somehow encompasses the award of physical custody as well, her argument is contradicted by her own opening brief (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1138), and the general rule is that arguments raised for the first time in the reply brief will not be considered absent good cause for the failure

29

*Section 361.2 and the Standard of Review.*

As relevant here, section 361.2 provides: "When a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (§ 361.2, subd. (a).)

"(b) If the court places the child with that parent it may do any of the following:

"(1) Order that the parent become physical custodian of the child. The court may also provide reasonable visitation by the noncustodial parent. The court shall then terminate its jurisdiction over the child. The custody order shall continue unless modified by a subsequent order of the superior court. The order of the juvenile court shall be filed in any domestic relation proceeding between the parents.

"(2) Order that the parent assume custody subject to the jurisdiction of the juvenile court and require that a home visit be conducted within three months. *In determining whether to take the action described in this paragraph, the court shall consider any concerns that have been raised by the child's current caregiver regarding the parent.* After the social worker conducts the home visit and files his or her report with the court, the court may then take the action described in paragraph (1), (3), or this paragraph. However, nothing in this paragraph shall be interpreted to imply that the court is required to take the action described in this paragraph as a prerequisite to the court taking the action described in either paragraph (1) or (3).

"(3) Order that the parent assume custody subject to the supervision of the juvenile

---

to present them before. (*In re Tiffany Y.* (1990) 223 Cal.App.3d 298, 302; and see *Brown v. Boren* (1999) 74 Cal.App.4th 1303, 1316 ["a litigant may not change his or her position on appeal and assert a new theory. To permit this change in strategy would be unfair to the trial court and the opposing litigant"].)

court. In that case the court may order that reunification services be provided to the parent or guardian from whom the child is being removed, or the court may order that services be provided solely to the parent who is assuming physical custody in order to allow that parent to retain later custody without court supervision, or that services be provided to both parents, in which case the court shall determine, at review hearings held pursuant to Section 366, which parent, if either, shall have custody of the child." (§ 361.2, subd. (b).)

Citing *Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300 (among other authorities), Priscilla acknowledges that in reviewing "exit orders," this court "may not disturb the orders unless the [dependency] court exceeded the limits of legal discretion by making an arbitrary, capricious or patently absurd determination."

According to the record, both Priscilla and Alejandro appeared at the November 14, 2012, detention hearing, along with their respective attorneys. At that time, Alejandro's counsel noted that the Department had recommended Alex's release to Alejandro as Alejandro had requested, with a supplemental report to address termination of jurisdiction as to Alex with a family law order. When the dependency court inquired regarding Priscilla's position on the request—in Priscilla's presence—Priscilla's attorney responded: "[M]y client is comfortable with the older two minors remaining in the care of their fathers." Alex's counsel also added that Alex "wishes to live with his father[] so I would join in that request," and as to both Alex and H.T., "also join[ed] in the request that the [D]epartment address closing their cases with family law orders at the next hearing." When the dependency court again asked if Priscilla had any requests, she again asked only that "the younger three boys—K[.], Fred[]rick [Jr.] and Christopher—be returned to her care." Alex (and H.T.) were then released to their respective fathers.

Initially, the Department expressed concern regarding Alex's placement with Alejandro based on the prior dependency proceedings in San Bernardino, in which drug use and incarceration on drug related charges were alleged. However, the dependency investigator subsequently interviewed Alejandro (as well as Alex and Priscilla) and

31

reported to the dependency court in this regard, ultimately recommending the court grant Alejandro sole physical (and joint legal) custody of Alex.

At the jurisdiction and disposition hearing, with Priscilla in attendance, Alejandro's counsel again requested termination of jurisdiction over Alex, expressly stating Alejandro "request[ed] a family law order giving him sole legal and physical custody." Again, Priscilla raised no objection (and made no contrary request), and the dependency court granted Alejandro's request.

On this record, we find no abuse of discretion in the dependency court's award of legal custody as to Alex to his father Alejandro W. Priscilla would have been entitled to a full evidentiary hearing on the issue had she requested one (see *In re Michael W.* (1997) 54 Cal.App.4th 190, 195-196), but she did not voice any objection whatsoever, despite repeated notice that Alejandro was seeking sole legal custody; moreover, she expressly stated she was "comfortable" with Alex's placement with Alejandro. Alex wanted to live with Alejandro; on Alex's behalf, Alex's counsel requested that the court grant Alejandro's request; and after expressing concern earlier, after interviewing the parties and investigating further, the Department was satisfied that granting Alejandro's request for sole *physical* custody was the proper recommendation. Under these circumstances, because she never raised the issue in the dependency court, Priscilla cannot assert this purported error on appeal. (*In re Anthony P.* (1995) 39 Cal.App.4th 635, 641; *In re Richard K.* (1994) 25 Cal.App.4th 580, 589-590 ["As a general rule, a party is precluded from urging on appeal any point not raised in the trial court. Any other rule would permit a party to play fast and loose with the administration of justice by deliberately standing by without making an objection of which he is aware"].)

For the same reasons, Priscilla cannot be heard to object now regarding the duration of visitation. Not only did she fail to raise any issue in this regard in the dependency court—notwithstanding the Department's recommendation to the dependency court regarding visitation, but Priscilla is simply incorrect when she states that she is limited to two hours, when the order states she is to be provided with a

"minimum" of two hours per month.  (*In re Richard K., supra* 25 Cal.App.4th at pp. 589-590.)

**The Dependency Court Did Not Abuse Its Discretion in Placing K.V., Fredrick V. and Christopher V. with their Paternal Grandmother.**

According to Priscilla, the dependency court abused its discretion in placing the three younger boys with their paternal grandmother and says they should have been placed with her own mother.  We disagree.

Presumably because she failed to raise this issue at the jurisdiction and disposition hearing, Priscilla notes she expressed the following concern at the detention hearing through her counsel:  "[Priscilla] is concerned that the children's placement with paternal grandmother [Olivia H.] will result in [Fredrick V. Sr.] having virtually unlimited contact with the children."  The dependency court responded, "That's why the Department makes unannounced home calls[, directing Fredrick V. Sr. to tell his mother of that risk.]  They can come by any time of the day.  That includes 2:00 a.m. in the morning because they do have people working at 2:00 a.m. in the morning.  [¶] If they find that you [Fredrick V. Sr.] are there, those kids are getting moved so quickly you wouldn't even know what happened.  You make sure your mother understands that."

Thereafter, the Department reported that the placement with the paternal grandmother was going well, and Fredrick Sr. was complying with the case plan.  Meanwhile, K. recanted his claims of Fredrick Sr.'s sexual abuse, explaining that Priscilla had threatened him that if he did not make the sexual abuse allegations, he would get "beat up," and Fredrick Sr.'s visitation was liberalized.  Furthermore, the Department's further investigation, including Priscilla's own interview statements, established that the maternal grandmother's home was *not* a suitable placement for the

33

three younger boys.[9]  On this record, we find no abuse of discretion in the dependency court's disposition order placing K., Fredrick Jr. and Christopher with Olivia H. "Placement decisions in dependency proceedings are 'committed to the sound discretion of the juvenile court, and the trial court's ruling should not be disturbed on appeal unless an abuse of discretion is clearly established. [Citations.]'"  (*In re A.S.* (2012) 205 Cal.App.4th 1332, 1340, quoting *In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)

### *DISPOSITION*

The orders are affirmed.

**WOODS, J.**

**We concur:**

**PERLUSS, P. J.**                                              **ZELON, J.**

---

[9]     As we previously noted, according to the subsequent minute orders, Fredrick V. Sr. completed the court-ordered services and his children (K., Fredrick Jr. and Christopher) were released to him on a home-of-parent order, under the Department's supervision.  (Thereafter, the matter was transferred to the dependency court in San Bernardino County.)