Filed 7/30/14  In re E.B. CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re E.B., et al., Persons Coming Under the Juvenile Court Law. | H039884 (Santa Cruz County Super. Ct. Nos. DP002727, DP002728) |
| SANTA CRUZ COUNTY HUMAN SERVICES DEPARTMENT, Plaintiff and Respondent, v. E.G., Defendant and Appellant. | |

Elva G., the mother of E.B. and J.G., appeals from orders declaring them to be dependents of the court pursuant to Welfare and Institutions Code section 300.[1]  The mother contends that there was insufficient evidence to support the juvenile court's determination that her children were described in section 300, subdivision (b).[2]  We affirm.

---

[1]    All further statutory references are to the Welfare and Institutions Code.

[2]    J.B. is the presumed father of E.  G.T. is the presumed father of J.  Neither father lived with the mother.  The fathers are not parties to this appeal.

## I. Procedural and Factual Background

### A. The Petition

On February 15, 2013, the Santa Cruz County Human Services Department (Department) filed petitions alleging that two-year-old E. and seven-year-old J. came within the provisions of section 300, subdivision (b).[3] Allegation b-1 stated that the Department had received three reports in the past two years regarding the sanitary and safety condition of the home. When the social worker made a visit on January 22, 2013, the home was so filthy that the children were placed in protective custody. Allegation b-2 stated that J. rarely attended school. When he did attend, he was dressed in dirty clothing and was very hungry. When E. was placed in protective custody, he was wearing pants that were several sizes too large and he was not wearing underwear or shoes. After the children left the social worker's office on January 22, 2013, the office and the social worker smelled of dirty clothes, urine, and feces. Allegation b-3 stated that the mother "presents as dazed and unresponsive." The mother reported that she suffered from posttraumatic stress disorder (PTSD), anxiety, and depression, which affected her ability to clean her home. The mother also reported that she used marijuana to cope with anxiety and depression.

### B. The Jurisdiction/Disposition Report

The jurisdiction/disposition report, dated March 19, 2013, recommended that the court establish jurisdiction and that the mother be provided with family maintenance services. It was also recommended that the children remain placed with their mother.

The report summarized the prior child welfare history. On August 3, 2011, a mandated reporting party went to the home and observed that it was cluttered, but not a

---

[3] A section 300, subdivision (g) (no provision for support) allegation as to E. was later stricken.

safety hazard.  The mother stated that she had trouble cleaning due to PTSD.  E. was present during the visit and appeared to be healthy and was wearing clean clothes.  On April 30, 2012, the reporting party visited the home at the mother's request.  The mother stated that she was overwhelmed by house cleaning.  The reporting party stated that there was no space to move in the home since there were piles of clothes and "junk" everywhere.  A week's worth of dirty dishes was piled in the kitchen.  The mother stated that she and her children slept on the couch in the living room because the back room was full of mold.  According to the reporting party, the children's clothing was adequate, but their hygiene could have been improved.  On December 2, 2012, the Department received a referral in which the reporting party alleged general neglect of J. and E.  It was reported that J. rarely made it to school.  When he did attend school, he was late and complained of being very hungry.  J. also frequently appeared dirty.  The mother stated that she could not afford to wash his clothes.  The reporting party also referred to the unsafe and unsanitary condition of the home.

On January 22, 2012, the social worker went to the mother's small mobile home, but the mother would not allow her to enter.  After sheriff deputies arrived, they and the social worker entered the home.  There was a strong odor of urine, dirt, and mold.  The floor was "entirely covered by clothing, garbage, toys, dirty diapers, soaked urine pads, rotting food, baby bottles with spoiled milk, shavings from the pet guinea pig's cage, guinea pig feces, shoes, ants, etc.  Every flat surface was piled one to two feet high with debris."  The interior of the refrigerator was covered with mold and filled with items, some of which were spoiled.  Photographs were attached to the report.  According to the mother, her depression, anxiety, and PTSD greatly impaired her ability to maintain a sanitary home and "to function within routine and structure."  She appeared to be overwhelmed by the circumstances and stated that she used marijuana to help her sleep.

3

E. was removed from the home and placed in foster care and J. was removed from school and placed with his brother.

On January 23, 2013, the mother was informed that when she removed the safety concerns in the home, her children could be returned to her care. The mother contacted family and friends, who immediately assisted her. They cleaned the house by the following day. The mother agreed that she would receive supportive services from the Department and "would cooperate with whatever was asked of her." After she tested negative for marijuana, the Department returned the children to their mother's care on January 25, 2013.

On February 25, 2013, the social worker interviewed the mother and showed her the photographs of her home. The mother expressed shock and dismay at the condition of her home and was open to receiving supportive services. G.T., the presumed father of J., expressed disappointment and sadness that the children were living in unhealthy and unsafe conditions. G.T. did not know how bad the inside of the home was and did not notice J. "looking or smelling dirty." He also stated that when he lived with the mother, he did the majority of the housework. According to G.T., the mother needs help. J.B., the presumed father of E., stated that he had minimal contact with the inside of the home and the mother would often not allow him inside. The mother would talk about feeling embarrassed about the condition of the home. J.B. would send E.'s godfather to the mother's home to assist her in cleaning. J.B. could smell urine on E. and the odor emanating from the house.

The social worker interviewed J. who stated that he often does not make it to school or is late. J. also stated that sometimes there is no food in the home and he goes to school hungry. School personnel confirmed J.'s statements.

When the mother stated that she did not smell the odor of her children, the social worker explained to her that she had become desensitized to the odor of both the home

4

and her children.  The mother also expressed remorse and shame relating to J.'s school attendance.  She stated that she had a difficult time enforcing a bed time for her children and she was also often tired in the mornings.

Both children were healthy with no developmental delays.   J.'s most recent academic report reflected improvement from satisfactory to excellent in all subjects.  The children had a difficult time with the removal from their mother in January 2013 and they continued to show signs of anxiousness, uncertainty, and confusion.

The Department recommended that the mother's case plan include, among other things, individual therapy with a provider who was approved by the Department, possible conjoint therapy with the children, parenting classes, a psychological evaluation, and a substance abuse assessment.

### C. The Jurisdiction/Disposition Hearing

The jurisdiction/disposition hearing was held on May 10, 2013.[4]  J.B. testified that he and the mother had shared custody of E. on a 50-50 basis, since E. was one year old.  However, about a month or two before January 22, 2013, J.B. did not have personal contact with E. due to a medical condition.  He had never seen the house in the condition portrayed in the photographs.

Terri Noto, a social worker, testified that she first went to the mother's home on January 22, 2013, and had made four additional visits since that date.  Noto continued to have concerns that the mother was unable to keep the house clean.  During the past three to four months, she had "watched it gradually deteriorate in a trend that's leading to the similar conditions as it was when [she] found it on January 22nd."  There was an unannounced visit by another social worker on April 30, 2013, and the home was "messy,

---

[4]     The juvenile court admitted the jurisdiction/disposition report and the updated case plan into evidence.

5

chaotic, in disarray. There were piles of paperwork and clothing and toys and miscellaneous debris over all flat surfaces. There were piles of clothing throughout – on the floors. None of us, you know, particularly cared about it being a perfect condition. But the gist of the main concern was that it – it was looking like it was going back in the direction of where it was." There was a new, untrained puppy that had urinated "all over the house," and thus the house smelled like urine. The feces from the guinea pig were also spilling out of its cage.

At the unannounced visit on April 30, 2013, the boys were clean and well-dressed. Since the Department had been involved in this case, J. attended school every day with one exception. The school reported a dramatic improvement in J.'s timeliness and appearance.

Noto had spoken with the mother about the importance of having a sanitary home. She believed that the mother might have "a psychological issue . . . that is getting in the way of her effectively keeping a clean house." Though the mother recognized that it was important, she was unable to do so. The mother had also failed to comply with all requirements of her case plan. She received assistance in enrolling E. in Head Start and was given applications on three different occasions since mid-March. However, he had not yet been enrolled for the fall session. A counseling referral was made to Children's Mental Health Services for J. and the mother was given the contact information. However, the mother "couldn't make it happen." The mother was re-referred to Children's Mental Health Services and the assessor was currently trying to connect with the mother. According to Noto, the mother had expressed a distrust of these services because they were connected to Child Protective Services.

The mother and J.B. were referred to a coparenting class at New View Counseling Center. However, the social worker conceded that another program would be more appropriate. Referrals were also made to the Parent Center for individual counseling for

the mother and an assessment for E.  However, the mother showed up on the wrong day for her appointment. Noto was also aware that the mother had been participating in a variety of services for the past few years, including counseling with Amber Schwaab and attending parenting classes with Dr. Deborah Vitullo.  However, Noto had not contacted Schwaab or Dr. Vitullo.  The mother completed a substance abuse assessment with Eva Gomez.  The social worker opined that if the Department were not involved in the present case, "there [was] nothing to prevent the situation to deteriorating back to where it was in January."

The court appointed child advocate met the children for the first time the day before the hearing.  They were happy and the mother was "very sweet with them" and they had a "nice relationship" with her.

The juvenile court admitted into evidence photographs taken at J.'s birthday party, which were taken two days before the children were removed from her home, and photographs of her home after it had been cleaned.  The mother testified that her home was currently clean, but "not perfect."  According to the mother, the home is not "going towards the directions that it was before."  There was "no offensive laundry problem," the sink had a "very normal amount of dishes," and surfaces were not contaminated.  She also testified that the dog was house-trained and there was no urine during the unannounced visit on April 30, 2013.  At that visit, the social worker noticed that "things were starting to accumulate," helped her remove some items from the home, and left with one large box and large bag.

The mother conceded that she had not yet submitted a Head Start application for the fall session.  The mother denied that J. ever went to school hungry.  According to the mother, she had a printout showing that J. was in the 98 percentile for height and weight. She also testified that she had a letter dated within the last week from Dr. Vitullo of

Families Together, which stated that Dr. Vitullo had always seen adequate food in the mother's home.

The mother was currently under the supervision of Dr. Wendy Sickels of the Santa Cruz Women's Health Center. She saw Dr. Sickels approximately every three months and takes medication as prescribed for depression, anxiety, PTSD, and insomnia. The mother had been taking anti-depressant medication for many years, but she was not taking it regularly in January.

E. has been evaluated at the Parent Center and the mother was supportive of his attending the Parent Center. The mother did not understand why J. had been referred to County Mental Health Services, which is in the same building as Child Protective Services and is a source of trauma for him. She wanted him to receive counseling at the Parent Center.

The mother was currently in the Positive Discipline class and the Positive Parenting Program, which is part of the Families Together. The mother worked with Dr. Vitullo in 2011, but took a break until the end of January 2013. Dr. Vitullo had come to her home approximately four times in the last month. The mother met Dr. Vitullo in her office once since January. The mother did not remember whether she told the social worker that she had four sessions with Dr. Vitullo at her home. The mother had participated in weekly therapy with Schwaab, a licensed clinical counselor, for approximately two months.

When the mother was asked why she did not want the Department and the court to be involved in her life, she testified that "it has been traumatic since they entered my home on January 22. I do feel like I have a lot of supportive professional people in my home that are very committed to keeping up with making sure that I continue with all of their supportive services. [¶] I'm no longer experiencing the isolation effect of PTSD. I'm now very much out in the public receiving the help that I need, that I have needed for

a while that I am very willing to accept, and actively participate in for the least one year I'm committed to doing that.  I'm guessing it may be more like two years of therapy, and every possible offering of support from spiritual counseling to psychologists to Triple P Parenting, Positive Discipline, anything offered at the Parent Center.  I am absolutely committed to doing all of that, with God as my witness."

Following the hearing, the juvenile court declared J.G. and E.B. dependent children, placed them in their mother's custody, and ordered family maintenance services.

## II. Discussion

The mother contends that the circumstances that led to the filing of the petition had been resolved by the time of the jurisdiction/disposition hearing, and thus there was insufficient evidence to support jurisdiction under section 300, subdivision (b).

In order to exercise its jurisdiction over a child in a dependency case, the juvenile court must find that the child is a person described by one or more of the section 300 subdivisions.  (*In re Michael D.* (1996) 51 Cal.App.4th 1074, 1082.)  Section 300, subdivision (b) provides in relevant part:  "The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child, . . . or by the willful or negligent failure of the parent … to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent or guardian to provide regular care for the child due to the parent's . . . mental illness . . . .  The child shall continue to be a dependent child pursuant to this subdivision only so long as is necessary to protect the child from risk of suffering serious physical harm or illness."  The juvenile court must determine "whether circumstances *at the time of the hearing*

9

subject the minor to the defined risk of harm. [Citations.]" (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 824.)

"Section 300 jurisdiction hearings require a preponderance of the evidence as the standard of proof. (§ 355, subd. (a).) In reviewing the sufficiency of the evidence on appeal, we look to the entire record for substantial evidence to support the findings of the juvenile court. We do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence, or determine where the weight of the evidence lies. Instead, we draw all reasonable inferences in support of the findings, view the record in the light most favorable to the juvenile court's order and affirm the order even if there is other evidence supporting a contrary finding. [Citations.] The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the order. [Citations.]" (*In re A.M.* (2010) 187 Cal.App.4th 1380, 1387-1388.)

Here, the condition of the mother's home on January 22, 2013, was extremely hazardous to her young children and created a substantial risk that they would suffer serious physical harm or illness. However, the mother's inability to maintain a safe and sanitary home for her children was not limited to this isolated incident. She had a lengthy history of being unable to clean her home. According to G.T., he did most of the housework when he lived with the mother until 2009. In August 2011, the mother acknowledged that her PTSD made housecleaning difficult. In April 2012, she stated that she was overwhelmed by housecleaning. The mother would often not allow J.B. into the home because she was embarrassed by its condition. The mother expressed shock and dismay at the deplorable condition of the house in January 2013 and was even unaware of its odor or that of her children. The mother acknowledged that her depression, anxiety, and PTSD greatly impaired her ability to maintain a sanitary home and "to function within routine and structure." When Noto visited the mother's home during the three to four months prior to the hearing, she observed the condition of the home "gradually

10

deteriorate." As recently as 10 days before the hearing, the home was "messy, chaotic, in disarray" with items covering all flat surfaces, piles of dirty clothes on the floors, an untrained puppy that had urinated "all over the house," and guinea pig feces spilling out of its cage. Even with the services provided by Dr. Vitullo, Dr. Sickels, and Schwaab, the mother's inability to provide a healthy environment for her children was a recurring issue. Thus, there was sufficient evidence to support the juvenile court's finding that there was a substantial risk at the time of the jurisdiction/disposition hearing that the children would suffer serious physical harm or illness as a result of the mother's mental illness or her negligent failure to provide them with adequate shelter.

## III. Disposition

The orders are affirmed.

_____
Mihara, J.

WE CONCUR:

_____
Premo, Acting P. J.

_____
Elia, J.

12